This is a child custody case.
The Circuit Court of Madison County after an ore tenus
hearing terminated the parental rights of the mother and father regarding two of the parties' minor children.
The parents, through able counsel, appeal from the action of the Madison County Circuit Court and we affirm.
The dispositive issue on appeal is whether there is sufficient evidence to support the order terminating the parties' parental rights. Put another way, is the evidence "clear and convincing" that the children's best interest would be served by terminating the parents' parental rights? As indicated, we find such evidence and affirm.
Viewing the record with the attendant presumptions accorded the circuit court's action, the following is revealed:
Frankie Lynn Hudgins and Nancy Hillis Hudgins, the parents, were married August 20, 1973. Neither had completed high school. Tammy Louise Hudgins, their first daughter, was born February 21, 1974. A second child, Nora Lynn Hudgins, was born February 23, 1975. A third child, who remains with the parents, was born February 4, 1976.
Since the couple's marriage, their life style has been characterized by both frequent job and address changes. There is evidence Mr. Hudgins has been both abusive and unfaithful to Mrs. Hudgins. When asked about a particular location, Mrs. Hudgins replied, "I don't remember where we moved. We lived in a lot of places." Mr. Hudgins has had approximately thirty different jobs with twenty-three different employers according to his own testimony. He also testified he had been convicted of highway intoxication in 1974, driving while intoxicated and resisting arrest in 1980, and of third degree escape. By his own admission, he can only read "a little but not much." According to Mrs. Hudgins, they currently spend about $10 to $15 a week on beer while Mr. Hudgins earns $500 gross per month from his job, and an extra $400-$500 per year from selling and racing race cars.
The Department of Pensions and Security was initially involved with the Hudginses and Tammy and Nora in late May, 1975, when they investigated a complaint. At that time the two girls were found to be dirty and ill with chicken pox. Nora was found on a dirty mattress with a bottle of solidified milk beside her. The Department of Pensions and Security left the children in the Hudginses' care contingent on the parents' following through with proper medical care. Follow-up contact was maintained *Page 915 
until the Hudginses moved again and the social worker was unable to locate them, and closed the case.
In October, 1976, while the couple was working as concessionaires at a carnival in Tuscaloosa, a tent in which they were living caught fire. Tammy and Nora were admitted to the local hospital with severe burns, and then transferred to a Birmingham hospital. Tammy, who suffered burns over 80% of her body, was transferred to Shrine Hospital Burn Center in Cincinnati, Ohio. Nora suffered burns primarily to her extremities, and received some skin grafts.
When Tammy was released from the Shrine hospital, Nora had already been back with the Hudginses a few weeks. Mr. and Mrs. Hudgins, both unemployed at the time, took Tammy home to a two bedroom house, without heat or indoor toilet facilities, though it did have cold running water. The Hudginses were given prescriptions for ointment for the children, along with special instructions on their care which included directions to bathe Tammy several times a day. Two days after Tammy was brought back to the Hudginses, the Department of Pensions and Security picked the children up. The social worker who picked up the children testified at the time they were picked up the two girls were dirty and had an unpleasant odor about them. A doctor who examined the children at that point described Nora as dirty, scabbed and crusting, with no ointment nor effective bandages on her. She was admitted to the hospital. He testified there was no evidence of any recent care for her burns. Upon examining Tammy, the doctor noted her dressings were dirty, no ointment had been applied, and she was not wearing her neck brace. He admitted Tammy to the hospital, cleaned her wounds and began a special program of exercises for her.
Soon after, Nora was placed with foster parents with whom she still lives after approximately five years. She still has health problems including allergies and asthma, and is being treated by an allergy specialist.
A psychologist testifying at the trial described Nora as neat, clean and of above average intelligence. Her relationship with her foster parents was described as warm and close. The doctor testified that Nora does not identify her natural parents as relatives, but considers her foster parents to be her true parents. Nora called her foster parents "Mother" and "Father," but refers to her natural parents as "Frankie" and "Nancy." In the psychologist's judgment, removing Nora from her current home would have a devastating effect, and could lead to a drop in school achievement and the development of clinical depression. Nora has repeatedly expressed fears that "Frankie" and "Nancy" will kidnap her. Her visits with her natural parents have been followed by spells of bed-wetting.
Her allergist testified that the living conditions and environment of her natural parents are more likely to generate allergy flare-ups, and that Nora's condition requires a specially cleaned and prepared house. The emotional upset of removing her from her current home might, the doctor testified, aggravate her condition.
Tammy was placed in the foster care of Corene Busbin, a retired registered nurse, in April, 1977, where she remained for almost four years. During this time, Ms. Busbin worked with special exercises with Tammy's damaged arms and hands. Tammy's current foster parents, neighbors and relatives of Ms. Busbin, developed a relationship with the child during this time, and Tammy selected them as her foster parents. All indications are it is a warm and loving relationship, and Tammy still receives help exercising her hand from Ms. Busbin at Tammy's foster parents' home.
Such evidence in the record supports the order terminating the parents' parental rights under the governing legal principles set forth in Ely v. Casteel, 341 So.2d 730, 734
(Ala.Civ.App. 1977), which are:
 "Where the dispute over custody of a child is between the child's natural parent and a party who is not the child's natural parent, the natural parent has a prima facie right to the child's custody. *Page 916 
However, the right is not absolute but is subject to the equally well settled rule that the best interests and welfare of the child are controlling in child custody cases. Borsdorf v. Mills, 49 Ala. App. 658, 275 So.2d 338 (1973)."
To remove custody from the natural parent there must be clear and convincing evidence that it would be against the best interests of the child to remain with the natural parent.Massey v. Massey, 410 So.2d 422 (Ala.Civ.App. 1981), cert.denied, 410 So.2d 426 (Ala. 1982). The trial court's judgment in cases of termination of parental rights is reviewed under the ore tenus rule. On appeal that judgment will be given every favorable presumption and will not be disturbed unless palpably wrong. Phillips v. Alabama Department of Pensions and Security,394 So.2d 51 (Ala.Civ.App. 1981).
After carefully considering the record in this case, this court finds the evidence to be "clear and convincing" that the best interests of Nora and Tammy were met by the circuit court's action. In particular, we note the lack of medical care given the children after their release from the hospital, the unusually unstable environment of the natural parents, the length of time the children have been separated from the Hudginses, and the emotional bonds which have developed between both children and their respective foster parents.
The children do not regard their biological parents as their parents; the evidence supports the psychologist's conclusion that the foster parents are clearly the psychological parents of the girls. The ties of affection resulting from years of association between the child and its custodian is a factor to be considered in such a case. Dale v. Dale, 54 Ala. App. 505,310 So.2d 225 (1975). The effect of taking a child away from those he has come to know as the source of love and care must be considered in determining the best interest of the child.See Borsdorf v. Mills, supra.
Prior to the burns, the natural parents had exhibited indifference to the children's health care as noted in the record by the children, their decayed teeth, dirty environment, and the apparent indifference toward medical care while the two girls had chicken pox. Both girls have and will continue to have special health needs. A social worker testified Mr. Hudgins acted indifferent during a discussion of Nora's allergies. The natural parents' past indifference to their medical care and their neglect in caring for the children's burns supports the trial court's determination. The health of the child is always a factor in these cases. Miller v. AlabamaDept. of Pensions and Security, 374 So.2d 1370
(Ala.Civ.App.), writ quashed, 374 So.2d 1378 (Ala. 1979).
We note the trial court specifically in a detailed order considered less drastic means than termination of the Hudginses' parental rights, including continuing the children's placement in long-term foster care with a continuation of the parental rights of the biological parents; termination of substantially all parental rights and placement with the Department of Pensions and Security for adoptive planning, but with the retention of some residual rights, such as visitation rights; allowing the Madison County Department of Pensions and Security to retain temporary custody and gradually bringing the children back into the home of the Hudginses by such means as longer, more frequent visits; or returning the children to Mr. and Mrs. Hudgins's care immediately. After consideration of the alternatives, the trial court concluded that termination was clearly and convincingly in the best interest of the children.See Ely v. Casteel, supra.
It is clear to this court that evidence in the instant appeal does meet the standard of "clear and convincing" as required by law, Hamilton v. State, 410 So.2d 64 (Ala.Civ.App. 1982), and therefore, the trial court's decree is due to be affirmed.
AFFIRMED.
WRIGHT, P.J., and BRADLEY, J., concur. *Page 917