BRADLEY, Judge.
This is a parental rights termination case. The Juvenile Court of Madison County terminated the parental rights of the mother, Susie Mastín, to all three of her children, Allenedra, Rodney Cornelius, and Quintet. Additionally, the court terminated the parental rights of Allenedra’s father, George Moore.
From this decree the mother appeals and presents two issues: (1) Did the trial court fail to recognize the right of the mother to the custody of her own children? (2) Did the trial court terminate the parental rights when there was no clear and convincing evidence before it?
The applicable law on this subject is as follows:
“ ‘Where the dispute over custody of a child is between the child’s natural parent and a party who is not the child’s natural parent, the natural parent has a prima facie right to the child’s custody. However, the right is not absolute but is subject to the equally well settled rule that the best interests and welfare of the child are controlling in child custody cases. Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973).’
“Ely v. Casteel, 341 So.2d 730 (Ala.Civ.App.1977).
“In a termination of parental rights case, the ore tenus rule applies. This means that the judgment of the trial *940 court is given every favorable presumption and will not be overturned unless it is palpably wrong. Hudgins v. State, 418 So.2d 913 (Ala.Civ.App.1982).
“Before a trial court can terminate a parent’s right to custody of its child, there must be clear and convincing evidence before the court that it would not be in the child’s best interests to be in the natural parent’s custody. Vinson v. AGAPE of Central Alabama, Inc., 416 So.2d 1075 (Ala.Civ.App.1982).”
Matter of Rivera, 444 So.2d 858 (Ala.Civ.App.1983).
Viewing the testimony with these presumptions, we find the following:
Susie Mastín was taken from her mother by the Department of Pensions and Security at an early age. Her mother had been diagnosed as schizophrenic. Susie was placed in several of DPS’s facilities, all of which she ran away from on numerous occasions. At least four times she was sent to the detention home. While in DPS’s care, Susie achieved an eighth grade education.
At age fifteen Susie gave birth to her first child, Allenedra. At sixteen Susie gave birth to Quintet. At nineteen her son, Rodney, was born. Each child has a different father. Quintet’s father is unknown. Susie has never been married.
Once released from the control of DPS, Susie fared badly. In March 1981 Susie’s mother complained to DPS that Susie was leaving Allenedra and Quintet with her for days at a time, and without adequate food. A DPS social worker, Irene Smith, began a lengthy involvement with the case. She visited Susie and found that Susie depended on friends for food, even though by then Susie was receiving extensive government assistance. Mrs. Smith took Susie to the mental health center, the well-child clinic, an OB-GYN physician, and to a family physician. She enrolled Susie in GED courses to prepare her to take a high school equivalency exam, which she eventually passed. DPS also provided homemaker services to Susie, whereby an agent, Margaret Morris, attempted to teach Susie parenting and housekeeping skills. Mrs. Morris helped Susie obtain completely government subsidized housing, government subsidized utility payments for at least one year, food stamps for sixteen months, ADC checks, free milk, and furniture for the house. She helped Susie prepare food and kept the children while Susie attended GED classes, to which she provided transportation. Mrs. Morris worked with Susie for sixteen months, meeting sixty-two times and accumulating one hundred forty-one hours with her. Even with all of the government assistance she was receiving, Susie was unable to fulfill her financial obligations. According to Mrs. Smith, this was due to Susie’s unwillingness to budget or follow the financial guidelines she had been shown. Mrs. Smith testified that Susie had adequate financial resources but would not use them properly. At times Susie reacted well to the assistance she was given. At other times Susie refused to even speak to Mrs. Smith when Mrs. Smith tried to talk to her.
Susie was enrolled in vocational rehabilitation to prepare her for employment. She was involved with this program for thirty-nine weeks, from March 1983 until September 1983. While there, Susie developed work skills but was demanding, inflexible, and lacked motivation and stability. Susie was terminated due to her unwillingness to cooperate and lack of motivation. She has since refused to reapply to the program.
In December 1983 Mrs. Smith took Susie to the employment office and later to a job interview at SCI Systems. SCI hired Susie and put her through a two and one-half day training program, which she successfully completed. Susie was terminated after two months and several attempts to find a job on which she could maintain the work pace.
In November 1981 Toney Pitts, a management coordinator for the Huntsville Housing Authority, was notified that Susie had vacated her government subsidized house. He visited the house, found that the utilities had been turned off, and that the house was unacceptably dirty. He ter *941 minated her involvement in the rental assistance program, only to give her another chance at DPS’s request. When he returned for a prearranged visit, he found that the utilities had still not been turned on and the house had still not been adequately cleaned. He again terminated her involvement with the program. Susie had had about one year’s free housing. Since then Susie has refused to reapply for the program, though she has been urged to do so.
In February 1982 DPS investigated a complaint that Susie had overdisciplined her children. Mrs. Smith found that Quintet, then fifteen months old, and Allenedra, then six years old, had been kept locked in a room. Quintet had seventy-five to eighty switch marks on her back, buttocks, thigh, stomach, and the top of her genital area. Allenedra also had bruises. The children were dirty and unkempt. When Mrs. Smith asked for some clean clothes for the children, Susie pointed to a pile of dirty, soiled clothes in the corner and said she had not had time to wash.
On March 4, 1982 Susie voluntarily entered into a foster care agreement with DPS. Under the agreement Susie would be able to regain custody of the children if she would secure adequate housing and financial means to care for the children.
On May 24, 1982 the court entered a shelter care order, placing custody of Rodney with DPS. Susie agreed to this. This was four days after Rodney’s birth. When questioned about where she would go from the hospital, Susie had stated that she could live with a half-sister and that she and the newborn child could sleep on a couch. Custody of the child has not been placed with Susie since then.
On July 12,1982 the court entered another order, placing custody of Quintet, Al-lenedra, and Rodney with DPS.
On August 18, 1982, and again on December 3,1982, Susie entered into a service agreement with DPS setting forth guidelines to allow her to regain custody of her children if she would obtain employment and housing. Susie never met the guidelines.
The court held a review hearing on March 1, 1983. The court again entered an order providing that DPS retain custody of the children until the mother obtained income and housing.
Susie continued to fail to find housing or income, and on July 28, 1983 DPS filed for permanent custody of the children. The court entered an order placing permanent custody of the children with DPS on April 2, 1984.
Since the order, Susie has not obtained employment or housing. She admits that she also has no place for the children to stay should they be returned to her, since she is living with her mother and three others in a two room house that is heated by a wood stove and does not have adequate ventilation.
From January 1981 until the hearing on permanent custody, Susie had had twenty-two residences, her longest one for six months. Mrs. Smith asserted that Susie has received the benefits of every service DPS has, as well as some from the community, and has not responded. The record is replete with attitude problems on Susie’s part and a general lack of willingness to assist herself or to avail herself of the many kinds of help that were offered to her.
Susie asserts that the trial court erred in not recognizing and protecting the natural parent’s right to custody of her children. We do not agree. A natural parent has a prima facie right to custody of children. Vinson v. AGAPE of Central Alabama, Inc., 416 So.2d 1075 (Ala.Civ. App.1982). However, these rights are not absolutely controlling and are subject to the best interests of the child. Vinson, supra. Here, the best interests of these children will be served by termination of the mother’s parental rights.
Next, Susie contends that there was no clear and convincing evidence upon which the court could terminate her parental rights. Again, we disagree. From the *942 facts as stated above, there was ample evidence from which the trial court could have terminated her parental rights.
For the reasons stated above, the judgment of the trial court is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur.