796 So.2d 365 (2000)
T.T.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
2990736.
Court of Civil Appeals of Alabama.
November 17, 2000.
*366 Timothy C. Burgess of Burnham & Klinefelter, P.C., Anniston, for appellant.
J. Coleman Campbell and Lynn S. Merrill, asst. attys. gen., for appellee Department of Human Resources.
Dee Anne Phillips, Anniston, guardian ad litem.
MONROE, Judge.
T.T., the mother, appeals from the trial court's judgment terminating her parental rights as to her 15 year old daughter, A.T.
The mother has seven children. The two oldest children do not live with the mother. One of those two remained in foster care until she was old enough to marry and, thereafter, moved out. The third child is the oldest son, who has been in and out of criminal facilities. The fourth child, A.T., is the child involved in this case. The fifth child is also in foster care. The two youngest children do reside with the mother.
The State Department of Human Resources, DHR, has been involved with this family since 1994, when DHR first removed A.T. and her siblings from the mother's physical custody. The record indicates that the children were later returned to the mother's custody. However, in November 1996, DHR again removed the children from the mother's custody. Apparently, at that time, the mother's home was without heat or hot water, and the home was in need of repair. The children resided with foster parents until they were returned to the mother's custody in May 1997. In June 1998, A.T. and her younger sister, L.A.T., ran away from the mother's home. A.T. has lived with a foster family since that date.
The mother contends that A.T. ran away because the mother would not allow her to date an older boy. A.T. claims she left the mother's home because she and the mother could not get along and the mother hit her. She testified that living with the mother was "chaotic" and "really bad."
After A.T. ran away from home, she was placed with a foster family. DHR created an "individual service plan" in which the mother was allowed supervised visitation with A.T. The parties agreed that visitation would occur one to two times per month. The record indicates that visitation did not occur as planned.
The termination of parental rights is an extreme matter, one not to be considered lightly. G.D.M. v. State, 655 So.2d 1020 (Ala.Civ.App.1995). Parental rights may be terminated if the trial court finds by clear and convincing evidence that the parents of a child are unable or unwilling to discharge their responsibilities to *367 and for the child. § 26-18-7(a), Ala.Code 1975. To terminate parental rights based on the state's petition, the trial court must first determine from clear and convincing evidence that the children involved are dependent. Ex parte Beasley, 564 So.2d 950 (Ala.1990). Then the court must find that there are no viable alternatives to termination of parental rights. Id. A trial court may consider several factors in determining whether a parent is unable to discharge responsibilities to and for the child, including whether reasonable efforts by DHR directed toward rehabilitation of the parent have failed. § 26-18-7(a)(6), Ala.Code 1975. In cases such as this, where the child is not in the physical custody of the parent, the trial court may also consider whether the parent has: 1) failed to provide for the material needs of the child or to pay a reasonable portion of the child's support; 2) failed to maintain regular visits pursuant to a plan with DHR; 3) failed to maintain consistent communication; or 4) demonstrated a lack of effort to adjust his circumstances to meet the needs of the child pursuant to an agreement or plan devised by DHR or a judicial review. § 26-18-7(b), Ala.Code 1975. Because the trial court was presented evidence ore tenus, its judgment is presumed to be correct and will be set aside only if the record indicates the judgment is plainly and palpably wrong. J.L.B. v. State Dep't of Human Resources, 608 So.2d 1367 (Ala.Civ. App.1992).
This is A.T.'s third placement in foster care. DHR has been involved with this family for six years, and DHR has provided this family ample services. Testimony indicated that the mother had been provided various services, such as Serajj Family Services, and counseling and other services through the Family Service Center, and that she had not cooperated with these programs. The evidence indicates that DHR's attempts to reunite the mother with this child have failed. The evidence indicates that initially, after the child ran away from the mother's home, various services were offered to enable a reunification. However, there is evidence that the mother did not cooperate with these programs. There was testimony that the Serajj Family Services program was presently working with the mother and that the mother was cooperating with that program. However, it appears that this cooperation began in November 1999, two years after A.T. was last placed in foster care. There was evidence which indicated that DHR had become involved with the mother's present living conditions in regard to the two youngest children and that the mother was working very hard to maintain custody of her two youngest children.
During the last two and a half years, while A.T. has been in foster care, she and the mother have not visited regularly. In fact, in the last year, they have had only eight visits. There was undisputed testimony that A.T. did not want to visit the mother. While A.T. has been in foster care, the mother has not maintained contact with her. The mother did not telephone the child. There was testimony that the mother had written A.T. letters. However, there was testimony that in the letters the mother basically blamed A.T. for all of their problems. The mother has not provided any financial support for the child.
As provided above, this child has been in and out of foster care, along with the rest of the children. DHR had reunited the mother and this child twice before. However, during A.T.'s third placement in foster care, the mother did not cooperate with DHR services. We note that the trial court is allowed to take judicial knowledge of all previous proceedings *368 and that it could consider the prior matters and is not required to forget the past. Clark v. State, 523 So.2d 131 (Ala.Civ.App. 1988).
It is clear that the mother failed to provide A.T. permanency. There was testimony that the mother had physically and emotionally abused A.T. A.T. has not been in the mother's custody for over two years. During this separation, the mother has failed to provide for the material needs of the child or to pay any support. The mother has failed to maintain regular visits and has failed to maintain consistent communication with A.T. The evidence establishes that after A.T. was placed in foster care, the mother failed to cooperate with DHR and did not attempt to adjust her circumstances to meet the needs of A.T. Reviewing the facts of this case in relation to the factors listed under § 26-18-7(a) and (b), Ala.Code 1975, we find that there is clear and convincing evidence to support the trial court's finding A.T. to be dependent.
The mother also argues that the trial court failed to consider long-term foster care as a viable alternative. We can assume that the trial court did consider this issue and determined that it was in the child's best interest to terminate parental rights and afford her a permanent home.
A.T. has now resided with her foster parents for two and a half years. A.T. testified that she did not wish to return to the mother's home. A.T. is presently adoptable, and she wishes to be adopted by her foster parents. When asked how her foster family differs from the mother, A.T. responded by stating that they love her and do not hit her.
A review of the record indicates that the parties questioned A.T. as to whether she understood the ramifications of being adopted and as to why she wanted to be adopted. Although one's desire for adoption is not the ultimate issue in a parental-termination case, "the retention of the child in the same environment is one factor the trial court may consider in determining whether to terminate parental rights." S.W. v. Walker County Dep't of Human Resources, 709 So.2d 1267, 1269 (Ala.Civ.App.1998) (citing B.S. v. Catholic Social Servs., 628 So.2d 682 (Ala.Civ.App. 1993)). Additionally, the "ties of affection resulting from years of association" between A.T. and the foster parents is a factor to be considered by the trial court. Hudgins v. State, 418 So.2d 913, 915 (Ala. Civ.App.1982). The ties between this child and her foster family are very strong. Even the mother admitted this in her brief to this court: "The minor child has been in foster care for over two years, the minor child already viewed her foster parents as her parents...."
The record contains clear and convincing evidence to support the judgment terminating the mother's parental rights. The judgment is affirmed.
AFFIRMED.
ROBERTSON, P.J., and YATES and THOMPSON, JJ., concur.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
The majority affirms a judgment terminating the parental rights of T.T. to her 15-year-old daughter, A.T. The record makes it clear that the State Department of Human Resources initiated this termination proceeding not because it considered the mother an unfit parent, but because it endorsed the teenaged daughter's preference to be adopted by another set of parents. I dissent.
The record before us indicates a fairly typical parent-teen conflict. Undoubtedly, *369 the mother-daughter relationship is strained and part of the fault lies with the mother. However, the record also demonstrates that the mother is not unfit. The mother's testimony indicates that she understands that her relationship with the daughter needs to improve before they are reunited and that long-term foster care could perhaps provide the opportunity for the relationship to improve so the daughter could return home.
The State's action in moving to terminate the mother's parental rights simply because the daughter would like to be adopted by another family is insupportable. "The termination of one's parental rights is a solemn matter that deserves the law's utmost protection." T.D.M.V. v. Elmore County Dep't of Human Resources, 586 So.2d 931, 932 (Ala.Civ.App.1991). "[A] ... decision terminating parental rights is final and irrevocable. Few forms of state action are both so severe and so irreversible." Santosky v. Kramer, 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The evidence presented in this case does not support "the last and most extreme disposition permitted by law, the termination of the parental rights of this [mother]." Bowman v. State Dep't of Human Resources, 534 So.2d 304, 306 (Ala. Civ.App.1988). The State did not establish by clear and convincing evidence either (1) that there were grounds for terminating the mother's rights or (2) that there were no viable alternatives to terminating those rights. See Ex parte Beasley, 564 So.2d 950 (Ala.1990).
In 1994, the Department of Human Resources ("DHR") first took the daughter and her siblings into protective custody. The record does not reveal the reason for the children's removal from the mother's home. The children were returned to the home in February 1996. DHR provided the mother with Serajj Family Services, parenting classes, and family counselling. In November 1996, the children were again removed from the home, this time because the house had no heat or hot water, and were placed in foster care. A local church helped the mother by reroofing her house and by providing food, appliances, cleaning supplies, and linens. Six months later, in May 1997, the children were returned to the mother. One year later, in June 1998, A.T., then 13 years old, and her younger sister, L.A.T., ran away from home.
A.T. testified that she ran away because she and her mother were not getting along, because her mother "was blaming her for everything, was making fun of her friends, and [her mother] had hit her on a couple of occasions." A.T. stated that sometimes when she and her mother got into an argument, her mother would hit her, "not with a belt or a switch or anything" but with an open hand, "usually on her back." At trial, when A.T. was asked what it was like living with her mother before running away, she stated:
"It was really loud and it was really chaotic, I guess. I mean it wasn't real fun at times. It was like really bad."
Calvin Overstreet, a licensed professional counselor, testified by telephone deposition at the trial of this case that he had counseled the mother and her children for "five or six years." He stated that he became involved "with the family as a whole, trying to keep the family together." He also stated that he had dealt specifically with the "relationship problems" between the mother and the daughter. He characterized the relationship as one of conflict based on "normal parent/teenager problems." Overstreet said that the mother-daughter conflict had escalated after an older brother left home. Overstreet continued:

*370 "Well, after [the older brother] left then it seemed like [the daughter] started she began to press a lot of mom. Mom would put down some rules and then [she] and [the daughter] started getting into verbal arguments which would escalate. And finally in the end what happened was [the daughter] just ran away. She just decided she would run away from home.
"Q. [By the mother's counsel]: Okay. And based on your meetings with the family were these boundaries that [the mother] set down, were these outrageous or unreasonable boundaries?
"A. No, they were just basic home rules. I think ... with [the daughter] when she ran away from home had to do with her wanting to go out with an older boy and [the mother] basically forbade her to do that. And in the end [the daughter] decided to run away.
"Q. And again, based on your contact with the family, do you feel that [the mother's] response in that situation was appropriate?
"A. Yes, I feel like it was appropriate for her to ... make that decision, to make that call."
After the runaway attempt, the daughter was again placed in foster care. Under the terms of an "individualized service plan" ("ISP") aimed at reuniting the daughter with her mother, all parties agreed that the daughter would have supervised visitation with her mother one to two times per month. The record indicates, however, that the planned visitation occurred very infrequently because DHR and the foster family left the decision whether to have visitation up to the daughter and the daughter apparently chose not to visit on a regular basis. In August 1999, the daughter expressed a desire to be adopted by her foster family. DHR then moved to terminate the mother's parental rights.
Penny McGee, a DHR foster-care worker with the Division of Family and Children's Services, acknowledged that "this termination [was] being pursued solely because... [A.T.] voiced her concern of wanting to be adopted." When asked, "This termination is not being pursued because of something that [T.T.] has done or not done, is that correct?" Ms. McGee replied, "Correct." When she was asked why "long-term foster care [was] not a viable alternative in this case," McGee responded that she would recommend to the judge either long-term foster care or adoption, but that she thought adoption was preferable because "long-term foster care would not give [the daughter] the permanency she is looking for.... [The daughter] is old enough and intelligent enough to make the ... decision that she wants to be adopted by the [foster] family."
In order to terminate parental rights, the trial court must find, first, from clear and convincing evidence, that the child is dependent, and, second, that there are no viable alternatives to termination of parental rights. Ex parte Beasley, 564 So.2d 950 (Ala.1990). According to § 26-18-7, Ala.Code 1975, the court must determine
"that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and [must find] that such conduct or condition is unlikely to change in the foreseeable future."
Most of the testimony at trial was concentrated on establishing that the daughter really wanted to be adopted by her foster family, that she understood what she was asking for, and that she appreciated the ramifications of her request. DHR did not present clear and convincing evidence *371 indicating that the mother was either unable or unwilling to discharge her parental responsibilities to the daughter. On the contrary, Calvin Overstreet gave his opinion that the mother was both willing and able to discharge her parental responsibilities. He explained:
"I don't see her as being unable to be a parent or to discharge her parental duties at this point. You know, I don't see that at all. [The mother] has workedin fact, the last year and a half to two years that I've worked with [her, the mother] has worked very hard, very, very hard.... She's done everything she can do to be ... an effective parent, to do the things that she needed to do. She ... realized that the home that she was living in was not appropriate, so she moved out of it. And as far as counseling and being involved in group and individual ... especially group, she would make a way to always be involved.... [The mother] worked real hard. I've got it documented, I've got documentation over and over again where [the mother] would doshe would walk, she'd make it to group, she'd do whatever she had to do to make sure that she was there and that she brought her children to therapy sessions and showed up during the visitations.... [S]he did everything in my eyes that she should have done or could have done to make things work."
Overstreet also gave his opinion that the mother presented no threat of physical or emotional harm to the daughter, that the mother "did everything that was requested of her by DHR," and that DHR did not do everything it could have done to "maintain this family unit."
The initial inquiry in this trial should not have been whether the daughter understood the ramifications of being adopted by her foster family or whether it was in her best interest to be adopted by her foster family. Instead, the inquiry should have been whether the grounds for termination, stated in § 26-18-7, had been proved and, if so, whether there was an alternative to termination, such as continuing the fostercare placement. In T.S. v. J.P., 674 So.2d 535, 538 (Ala.Civ.App.1995), this court held that "best interests" is not the correct inquiry at the first stage of a termination case. Writing for the court, Judge Thigpen explained:
"The mother persuasively argues that the trial court erred in terminating her parental rights without following the applicable provisions of the CPA [Child Protection Act], specifically § 26-18-7, in that it used an improper standard. While the best interest of the child is always a paramount concern in such cases, the trial court erred in applying the `best interest' standard to the question regarding the termination of the mother's parental rights. The termination of parental rights standard provided by the CPA, and the case law interpreting the CPA, should have been applied. Accordingly, the judgment must be reversed and the cause remanded for the trial court to apply the proper standard to reach a decision."
674 So.2d at 538 (emphasis added). The child's "best interests" come into play only after a decision to terminate parental rights has been made. Thus, the trial court should have determined, first, whether the mother was a fit parent and, if not, whether continuing foster-care placement was a viable alternative to terminating the mother's rights; and only then, after answering the first two inquiries, whether it was in the best interest of the daughter to be adopted by the foster parents.
The first stage of a termination proceeding does not allow a weighing of the child's "best interests." Santosky v. Kramer, 455 U.S. at 759, 102 S.Ct. 1388. In Santosky, the Court held:

*372 "The [first stage of a parental rights termination proceeding] does not purportand is not intendedto balance the child's interest in a normal family home against the parent's interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural parents are at fault. The questions disputed and decided are what the State did`made diligent efforts,'and what the natural parents did not do."
455 U.S. at 759-60, 102 S.Ct. 1388. The Court continued:
"However substantial the foster parents' interests may be, they are not implicated directly in the [first] stage [of a termination-of-parental-rights proceeding].... For the foster parents, the State's failure to prove [the grounds for termination of parental rights] may prolong the delay and uncertainty until their foster child is freed for adoption. But for the natural parents, a finding [of the grounds necessary for termination] can cut off forever their rights in their child."
455 U.S. at 761, 102 S.Ct. 1388 (citation omitted).
DHR did not present clear and convincing evidence indicating that the mother was unable or unwilling to discharge her responsibilities to the daughter. Moreover, the record clearly establishes that continued long-term foster care was a viable alternative to termination of the mother's parental rights. Therefore, the judgment of the juvenile court should be reversed.