864 A.2d 1066

**In re: NATHANIEL A., Madeline C., and Shirah A.**

**Nos. 2850, Sept. Term, 2003, 610, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Jan. 3, 2005.

582

Peter F. Rose (Nancy S. Forster, Public Defender on the brief), Baltimore, for Appellant.

C.J. Messerschmidt, Nancy C. Hopkins (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellees.

Panel: DAVIS, SHARER, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, Judge.

On October 20, 2003, the Montgomery County Department of Health and Human Services (Department) filed shelter care

petitions concerning Nathaniel A. and Madeline C. A hearing was held on that same date and on November 3, 2003, the Department filed its first amended child in need of assistance (CINA) petition. On November 14, 2003, the maternal grandparents filed a motion to intervene, which was subsequently granted by the court on December 10, 2003. On December 9, 2003, the Department filed its second amended CINA petition and four hearings ensued on January 28, 29, and 30, as well as on February 2, 2004. The Circuit Court for Montgomery County (Savage, J.) found both children CINA.

Shirah A. was subsequently born on April 14, 2004 to appellant mother and was immediately placed in the care of the Montgomery County Department of Health and Human Services (Department) by Child Protective Services. The Department filed a child in need of assistance (CINA) petition on April 15, 2004. A hearing was conducted on May 13, 2004 and the circuit court (Boynton, J.) found Shirah a CINA. We have consolidated appellant's two timely appeals where she presents one question for our review, which we rephrase as follows:

1. Did the circuit court err in adjudicating Nathaniel, Madeline, and Shirah CINA?

We answer in the negative. Accordingly, we shall affirm the judgment of the circuit court.

## FACTUAL AND LEGAL BACKGROUND

Officer Darley of the Montgomery County Police Department's Family Crimes Division testified that on the night of October 18, 2003, after he was informed of a report of a child abuse incident, he proceeded to the Shady Grove Hospital. He subsequently interviewed appellant and she explained that on October 17, 2003, her son, Nathaniel, had been "acting up" and decided to go to bed in the clothes he wore that day. During the night, she changed his soiled pants; Nathaniel refused to use the toilet and was generally uncooperative. When she grabbed and pulled his left arm by the wrist, he began to cry. Appellant consequently applied Bengay to the

child's arm, gave him Children's Tylenol, and sent him to bed. Appellant told Officer Darley that Nathaniel complained of arm pain the following day and she decided to take him to Night Time Pediatrics, which referred her to Shady Grove Hospital.

After admitting to Officer Darley that she had initially told the doctors that Nathaniel had been hurt at the playground, she admitted that she had caused the injury. Officer Darley explained that appellant told him when she pulled on Nathaniel's arm and fractured it, it was out of frustration and anger due to a difficult day. Appellant apologized for her actions and explained that she had lost her temper.

Jennifer Knotts, of the Department, testified that she interviewed appellant at the hospital. Appellant stated to Knotts that Nathaniel was being difficult and she pulled on him to stop him from moving so she could change his pants. She also explained to Knotts that her son had acid reflux problems.

Dr. Julian Orenstein, the treating physician at the hospital, stated that Nathaniel told him that appellant "grabbed his arm, twisted, then crack." Dr. Orenstein revealed that the x-ray of Nathaniel's arm showed a transverse fracture of the humorous bone, and this type of injury could only result from a "high degree of force."

Department caseworker Sandra Lopez testified that appellant had described Nathaniel's acid reflux issues, as well as prior medical problems to her. She explained that the father's whereabouts were unclear and at best, his contact with the children was "on-and-off." Lopez asserted that appellant was exceptionally concerned with the health of Nathaniel and relayed to her that he had a history of vomiting, stomach problems, and was lactose intolerant. Lopez testified that Nathaniel appeared to be a "healthy" child and appellant acted overly concerned with his medical condition.

Dr. Muriel Wolfe of the Children's Hospital testified that she examined Nathaniel and Madeline on March 13, 2003; appellant complained that he had been vomiting. Dr. Wolfe described Nathaniel's numerous doctor visits and noted that

appellant continually insisted on further referrals. Dr. Wolfe concluded that Nathaniel had no serious condition and saw him for a follow-up visit one month later. At some point in 2003, Dr. Wolfe stated that appellant urged her to declare that Nathaniel's "disability" qualified her for "SSI" benefits, but she declined to accept the doctor's advice. Dr. Wolfe concluded that Nathaniel was in general good health, although an endoscopy revealed a slight irritation of the esophagus. She also expressed her concern that she felt appellant exaggerated Nathaniel's condition and was exceptionally worried about Nathaniel's health. Appellant complained to Dr. Wolfe that Madeline had crooked legs and, although Dr. Wolfe doubted this assertion, she referred Madeline to an orthopedist due to appellant's insistence.

Esther Herman, a therapist in Rockville, Maryland, testified that she met appellant and her children in August 2003 when Madeline was referred to her for speech therapy. Appellant also brought Nathaniel in the hopes of having Herman assist in rectifying his health and behavioral issues. Herman noted that Nathaniel had been in treatment for his behavioral problems since October 2003 and she believed appellant was consumed with his purported health problems.

Pediatrician Dr. Allison Jackson testified that she reviewed Nathaniel's and Madeline's medical file and stated that Nathaniel had been subjected to numerous medical visits, diagnoses, and various treatments for his health issues. She testified about his prior behavioral and health problems and asserted that the symptoms of which appellant complained concerning Nathaniel did not match the ultimate diagnoses. Dr. Jackson concluded that Nathaniel's medical treatment was "excessive," and consequently, "abusive." Although she noted that appellant did not invent symptoms for Nathaniel, Dr. Jackson stated that Nathaniel was "at risk" because of the fractured arm incident.

Psychiatrist Dr. Joanne Brant testified that Nathaniel had thirty-seven doctor visits in twenty-seven months and they generally related to Nathaniel's feeding problems, vomiting,

sensory food aversion, dependency on a bottle and milk, and inability to calm himself. Dr. Brant concluded that appellant was likely an overanxious parent.

Both maternal grandparents testified that Nathaniel and Madeline were currently living in their homes and were of general good health and doing well. The circuit court engaged in an in-depth review of the CINA petition line by line and declared which facts were sustained, using the preponderance of the evidence standard, and, based on the testimony, which facts it did not believe had been established. She found that appellant fractured Nathaniel's arm when she pulled on it out of frustration and anger and his numerous doctor visits and treatments disclosed no serious medical conditions. The hearing judge explicitly credited the statements that the injury was non-accidental. She also credited the testimony of Officer Darley and Knotts that appellant stated her anger and frustration led to the incident. The circuit court concluded:

> There were and are significant issues that this mother faces in her own life that have had huge influences on her children ... What I can find by a preponderance of the evidence is that Nathaniel was in fact abused and injured by virtue of the arm fracture. I also find by a preponderance of the evidence that he was subjected to unnecessary and excessive medical interventions, which amount legally to abuse.

* * *

> But the picture of the mother that was so vivid in my mind or is so vivid in my mind, call it what you will, it's someone that is I guess obsessed in a way, and I don't mean that in a clinical way, with health concerns. And the health concerns of the children. In a way that is detrimental to them. And that's the key.

> Of course, we want parents to be worried about their children's health. But when it comes to visits in the numbers of 40s, 44 visits. And after all of that, what you come out with is mild esophagitis and treat with Prevacid. I

mean I shutter to think what this child was subjected to over and over and over again. Sort of seeking another opinion, wanting something to be wrong. And endoscopy, which is a very invasive procedure. The trips to an allergist which for a very young child to have blood drawn and have skin pricks, to what end, to what end?

He goes to their great grandparents and the grandparents and by their testimony he's fine. He's fine. And Dr. Jackson's testimony in a nut shell, how did he get fine so fast? ... I mean is that coincidental? I don't think so. I don't think so.

[T]his is Dr. Wolf's words, "she wanted to make sure there were problems with these children." [W]e're talking about two very young children here. And I will grant you that Nathaniel has been dragged through a whole lot more than Madeline has. But there is enough of a pattern here that when you, look at all of Nathaniel's visits and then when you look at Madeline's at a mere two years that it gives rise in the Court's mind and by a preponderance of the evidence a finding that she is at significant risk for having this repeated for her.

I have read *Andrew A.* It does come out of this county. I've read *William B.*, and also *Dunstin [Dustin] T.* touches on this as well. And one does not have to wait until each child in succession to see what happens ... [s]o one must look at the history to Nathaniel in assessing the risk to Madeline.

In assessing that risk, the Court looks at the age of the children, the history of what actually has happened to Nathaniel, looks at the mother's own expert's report, which states that she has major depression and that she's not being currently medicated for that depression. And also noted a personality disorder.

The incident with the fracture is clearly I find beyond a reasonable doubt if anybody wants me to, which I don't need to. That was abuse ... [b]ut when the mother grabbed this child in the way that she did because of anger, because of frustration, take anger out of it if you want,

because of frustration, because things have been going so badly for him, for her, and between them, she injured him grievously. A transverse fracture of the humorous, as Dr. Orenstein said, that was caused by a great deal of force.

[I]'ve heard so little about the father. I've heard so little that I can credit that I have no idea who he is, where he is, what his intentions are, what his thoughts are, what his ability to help is, what his financial situation is ... So in terms of each of the parents I make a finding of the father ... He has neglected [the children] by his absence if I credit that. He's neglected them by not attending their needs and if you will protecting them from [appellant's] excessive medical intervention pattern ... He is unwilling and unable from the evidence that I have to give them proper care and attention. He may be able but I have no evidence that he is or that he has been able ... I have nothing dispositive about the father from which I can conclude that he is anything other than neglectful, unwilling, and unable to care for his children.

In terms of the mother, I find that she has abused ... Nathaniel directly and physically in the broken arm injury. Her pattern of seeking medical intervention amounts to abuse, as defined in our CINA statutes, as well for Madeline. I don't have any evidence of physical, direct physical, abuse, but I find, based on the history here, and the patterns that appear in this evidence, that she, too, is at significant risk of this pattern of excessive medical intervention ... [and appellant's] untreated psychiatric conditions as set forth by her own experts force me to conclude that she, too, is unable ... at this juncture, to give proper care and attention to her children and their needs.

I have already given my opinion as to the credibility of Detective Darley and social worker Jennifer Knotts, as to the incident with the broken arm, as it was corroborated by the mother, and the child's own words at the hospital ... [d]r. Orenstein's physical findings corroborate and confirm that explanation of what happened on that night.

Whatever is motivating her, whatever malady, if there is one, that has caused her to behave as she has in the last 4.5 years with Nathaniel and Madeline, is sufficient, in my mind, call it what you will, it is sufficiently serious to cause a significant risk or harm to the children. I so find.

In Shirah's case, the circuit court based its CINA finding on its analysis of the record introduced by the State, from Nathaniel's and Madeline's hearings held on January 28, 29, and 30 2004, as well as February 2, 2004, the State's Petition, and oral argument. When appellant's children were found to be CINA, she was pregnant with Shirah. As noted, *supra*, when Shirah was born, she was subsequently placed in the care of the Department.

At the May 13, 2004 hearing, the Department elected to proceed in summary fashion, and, over appellant's objection, the circuit court took judicial notice of the prior case regarding appellant's other children. The circuit court concluded, based on its reading of Maryland Rule 8–421 and 8–425, that:

So it seems to me that, since an injunction has not been placed upon the order of the findings of this court, that they're still valid. And because prior court orders are valid considerations for judicial notice, I think at this time that the prior order of the court would be a proper item for me to take a judicial notice, of which to take judicial notice.

So because there's, it seems to me there's been no motion to stay or there's been no injunction issued at this time, that the order still is valid and that I can take judicial notice of it. It seems that taking judicial notice is an alternative method to calling witnesses from an evidentiary point of view and so I think at this point, given the fact that it's still a valid order, that would be a proper, that would be one means by which the Department could establish those facts.

\* \* \*

The Court: Well, let me ask you this, in the last hearing, Shirah was not a party, correct?

[Appellant's Counsel]: She was not born.

The Court: She was not born. So obviously the [appellant's] treatment of Shirah was not an issue so no evidence was presented at that time. So my understanding is, the Department wants to present fact findings regarding [appellant's] treatment of the other children to establish a pattern and therefore risk to the newly born child. Although I think that I can consider that, that certainly wouldn't preclude you from having [appellant] testify about her treatment of the newborn baby for me to consider on the issue.

\* \* \*

[Appellant's Counsel]: But in this case, if they [prior witnesses from other case] were to come forward today, like Dr. Jackson, let's say—

The Court: Right. Yes, so you can call those witnesses and ask the same questions.

[Appellant's Counsel]: Right, but it's their case.

The Court: No, I understand. So if what they present to me falls short of their proof, it falls short of the proof.

[Appellant's Counsel]: Right.

The Court: I mean, I'm not pre-judging what the proof standard is or whether it's going to meet it or not. They have to decide what they want to offer and if it doesn't meet it, it doesn't meet it.

[Appellant's Counsel]: Right.

The Court: If it does, it does. But that doesn't preclude anyone in this room from calling any witness they want to call to ask any questions they want to ask.

[Appellant's Counsel]: That's true.

The State subsequently offered the transcript of the prior hearing and petition as its evidence and announced its intention to call witnesses for the dispositional phase of the hearing. The circuit court then asked appellant's counsel if he planned to call any witnesses, and he responded that he did not. The hearing judge stated that "I guess what I need to do then is

read the transcript and then hear argument about whether what's presented in this transcript meets the burden of proof for finding CINA with regard to Shirah." The hearing commenced one hour later and appellant argued a motion to dismiss. The circuit court first reviewed the CINA petition and found that physical abuse had occurred and that, since the incident, appellant's angry and frustrated demeanor has not changed and appellant has not sought treatment or counseling. The prior record also indicated that appellant excessively brought Nathaniel to the doctor, which the court found "abnormal" and "excessive." He noted that appellant's abnormal condition had not been addressed and that both of these conditions were the basis in the prior case in finding that Madeline was at risk and should be declared a CINA. The circuit court therefore concluded that:

> ... because the anger and frustration is what led to the manifestation of the physical abuse, the snapping and the breaking of the arm, and because the psychiatric or psychological or personality disorder is what led to this behavior of excessive medical attention, those conditions still exist as far as I can tell. There's been no evidence produced to the contrary. And in the prior case, because those conditions existed, it created a substantial risk to Madeline because of her youthful age. She was only two years old. She was unable to verbalize and she was unable to really protect herself. And I think that risk is beyond the ordinary risk because of the conditions that exists in this particular mom, as opposed to moms that don't have these conditions. And they're untreated conditions.

> With regard to this girl, Shirah, she is even younger. She's only I guess a month old tomorrow. And she is less verbal and less capable of taking care of herself. And so I think as long as the conditions still exist that led to the breaking of the arm and led to the excessive medical treatment, that there is a substantial risk that that same manifestation could occur to this child. It would be due to the fact that she's younger and more vulnerable and less verbal.

So with regard to the mom, because I find that her condition, that conditions still exist that cause her to commit to physical abuse and also to subject Nathaniel to excessive medical condition, I find that she's unable and unwilling to provide for the need of this child. And as a result of that, this child is subjected to, her safety and welfare is at risk.

* * *

So for those reasons, I'll find that, even though there's been nothing, no direct harm done to Shirah, no direct action taken against her at this time, I believe that the prior pattern which was caused by the existence of conditions that have not yet been treated or changed, creates a substantial risk of harm to the child. And so I'll make the finding at this time.

## LEGAL ANALYSIS

### I

Appellant contends the circuit court erred in finding her three children CINA. We disagree. It is axiomatic that parents have the fundamental constitutional right under the Fourteenth Amendment to raise their children as they choose, without excessive interference from the State. We explained those rights in *Wolinski v. Browneller*, 115 Md.App. 285, 693 A.2d 30 (1997), which was favorably quoted by the Court of Appeals in *In Re Yve S.*, 373 Md. 551, 566–67, 819 A.2d 1030 (2003). We stated in *Wolinski:*

> Beginning with *Meyer v. Nebraska*, 262 U.S. 390[, 43 S.Ct. 625, 67 L.Ed. 1042] (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510[, 45 S.Ct. 571, 69 L.Ed. 1070] (1925), the Supreme Court, in a variety of contexts, has recognized that freedom of personal choice in matters of marriage, family life, and the upbringing of children is a liberty interest protected by the Fourteenth Amendment. *See M.L.B. v. S.L.J.*, 519 U.S. 102[, 117 S.Ct. 555, 136 L.Ed.2d 473] (1996)(termination of parental rights).

Within the narrower context of the parent-child relationship, the Supreme Court has deemed the right to rear a child "essential," *id.*, and encompassed within a parent's "basic civil rights." *Skinner v. Oklahoma,* 316 U.S. 535[, 62 S.Ct. 1110, 86 L.Ed. 1655] (1942). Maryland has consistently echoed the Supreme Court, declaring a parent's liberty interest in raising a child a fundamental one that cannot be taken away unless clearly justified. *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112[, 642 A.2d 201] (1994); *In re Adoption/Guardianship Nos. CAA 92–10852 & CAA 92–10853,* 103 Md.App. 1, 12[, 651 A.2d 891] (1994)("This right is in the nature of a liberty interest that has long been recognized and protected under the state and federal constitutions.").

\* \* \*

The Supreme Court has emphasized, however, that "rights of parenthood are [not] beyond limitation," *Prince[ v. Com. of Mass.],* 321 U.S. [158] at 166[, 64 S.Ct. 438, 88 L.Ed. 645 (1944)], and that the "state has a wide range of power for limiting parental freedom and authority in things affecting a child's welfare ...". *Id.* at 167[, 64 S.Ct. 438]. Thus, a parent's right to direct his or her child's upbringing is not absolute. Rather, Due Process analysis requires the delicate balancing of all of the competing interests involved in the litigation. *See, e.g., City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 427[, 103 S.Ct. 2481, 76 L.Ed.2d 687] (1983)(balancing individual's rights against the State's interest in regulating abortion); [*Wisconsin v.* ]*Yoder,* 406 U.S. [205] at 221[, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)] (balancing individual religious freedom and parental autonomy against the State's interest in preparing citizens to be self-reliant participants in society). In the context of most family law disputes over children, the State's interest is to protect the child's best interests as *parens patriae*—a derivation of the State's interest in protecting the health, safety, and welfare of its citizenry. *See, e.g., Santosky[ v. Kramer],* 455 U.S. [745] at 766[, 102 S.Ct.

1388, 71 L.Ed.2d 599 (1982) ]; Judith L. Shandling, Note, *The Constitutional Constraints on Grandparents' Visitation Statutes*, 86 COLUM. L.REV. 118, 129 (1986)("The state's power to intervene ... is derived from its *parens patriae* power, which allows the state to act when the welfare of an individual who lacks the capacity to protect her own best interest ... is at stake.").

115 Md.App. at 297–301, 693 A.2d 30 (some internal citations omitted). *See In re Adoption/Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 796 A.2d 778 (2002).

With the above precepts in mind, we turn to the merits of appellant's argument.

Md.Code (1998 Repl.Vol., 2001 Supp.), Cts. & Jud. Proc. (C.J.), § 3–801(f) defines a child in need of assistance as "a child who requires court intervention because:"

(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

An allegation that the children are CINA must be proven by a preponderance of the evidence. C.J. § 3–817(c). The circuit court's CINA adjudication will not be set aside unless clearly erroneous. Md. Rule 8–131(c); *In re: Michael G.*, 107 Md.App. 257, 264, 667 A.2d 956 (1995). In the case, *sub judice*, there was sufficient evidence to support the circuit court's decision that Nathaniel and Madeline were CINA and, therefore, the court did not err.

The circuit court found that appellant fractured Nathaniel's arm out of frustration and anger and exposed him to excessive medical treatment. The hearing judge concluded that, taking into account those issues and appellant's untreated anger, frustration, and depression problems, Nathaniel was a CINA. She noted that appellant had sought no help nor shown any change in her conditions. We believe the fractured arm, coupled with the excessive medical treatment, as well as appellant's current anger, frustration, and depression prob-

lems, are sufficient evidence to declare that Nathaniel was a CINA.

■ Although the hearing judge found appellant had not physically abused Madeline, or subjected her to the excessive medical treatment to which Nathaniel was exposed, based on her reading of *In re: Andrew A.,* 149 Md.App. 412, 419, 815 A.2d 931 (2003), *cert. denied,* 374 Md. 583, 824 A.2d 59 (2003), *In re: William B.,* 73 Md.App. 68, 72–73, 533 A.2d 16 (1987), and *In re: Dustin T.,* 93 Md.App. 726, 736, 614 A.2d 999 (1992), she concluded that Madeline was a CINA. Based on the prior conduct of appellant, we must determine whether Madeline is at a "substantial risk of harm," which would require that she be deemed a CINA. *In re: Andrew A.,* 149 Md.App. at 419, 815 A.2d 931; *In re: William B.,* 73 Md.App. at 72–73, 533 A.2d 16.

The issue presented is whether appellant's "ability to care for the needs of one child is probative of [her] ability to care for other children in the family." *William B.,* 73 Md.App. at 77, 533 A.2d 16. We recently opined that:

[a] 'substantial risk of harm' constitutes 'neglect.' Thus, if there are two children involved in a parent's act or omission, but only one child is harmed, there nevertheless may be neglect of the second child if, depending on the facts, the act or omission created a substantial risk of harm to the second child.

*Andrew A.,* 149 Md.App. at 418, 815 A.2d 931. We have held that "[t]he judge need not wait until the child suffers some injury before determining that he is neglected. This would be contrary to the purpose of the CINA statute. The purpose of the act is to protect children—not to wait for their injury." *In re: William B.,* 73 Md.App. at 77–78, 533 A.2d 16.

The circuit court's determination that Madeline was at a substantial risk of being subjected to the same conditions to which Nathaniel was exposed was not clearly erroneous. Appellant fractured Nathaniel's arm out of frustration and anger, subjected the child to forty-four unnecessary doctor visits, has a depression problem, and has sought no help nor shown any

change in her conditions that would lead us to believe that Madeline would not be subject to the same harm to which Nathaniel was exposed. Appellant's inability to appropriately care for Nathaniel is predictive of her ability to care for Madeline. We need not wait until Madeline is actually harmed; rather, based on the conduct of appellant towards Nathaniel, we may find her to be at risk and, therefore, a CINA. *In re Adoption/Guardianship No. T00032005,* 141 Md.App. 570, 606, 786 A.2d 64 (2001); *Dustin T.,* 93 Md.App. at 731, 614 A.2d 999; *William B.,* 73 Md.App. at 77, 533 A.2d 16.

The circuit court concluded that the father was either unable or unwilling to care for the children due to his absence and lack of involvement in the children's lives. Our review of the record does not indicate that the circuit court was clearly erroneous in its findings and ultimate conclusions regarding the ability of either parent to care for Nathaniel and Madeline.

## II

Appellant further contends on appeal that Shirah's hearing was inappropriately "conducted in summary fashion and without any formal presentation of proof ... the burden of proof was improperly shifted to [appellant] ... [and] the evidence does not support a CINA finding." We disagree.

Before deciding if Shirah was in fact correctly adjudicated a CINA, we must first address appellant's assertion that the circuit court's "summary fashion" of the hearing was inappropriate. Appellant correctly noted that the Department bore the burden to show Shirah was a CINA and that "the allegations in a Petition ... shall be proved by a preponderance of the evidence." Md. Rule 11–114(e)(3). The State moved into evidence the transcript of the prior proceedings that detailed the CINA determination as to Nathaniel and Madeline and the Petition to declare Shirah a CINA; the trial judge took judicial notice of the record from the prior hearing.

The hearing judge extended an opportunity to appellant, to present witnesses, including the same witnesses, if she de-

sired. The State was permitted to "decide what they want to offer and if it doesn't meet [the standard of proof], it doesn't meet [the standard of proof]." The circuit court explained to appellant, several times, her right to call witnesses and present her defense to the State's evidence. The hearing judge specifically stated to appellant that "you can call those witnesses and ask the same questions" and "that doesn't preclude anyone in this room from calling any witness they want to call to ask any questions they want to ask." Counsel argued a motion to dismiss, however, appellant chose not to call any witnesses or dispute the contents of the transcript and Petition with other evidence until the adjudication had ended and the court found Shirah to be a CINA. Appellant offered witnesses after that ruling in the disposition phase of the hearing. Proceeding in this 'summary fashion' did not cause the burden to be shifted to appellant.

Taking judicial notice of the prior hearings by the hearing judge was not inappropriate. The mother was a party to the prior hearings; she had the opportunity to defend herself through cross-examination; she was represented by counsel at those hearings; the facts relied upon were identical to the facts in the prior litigation; neither party demonstrated that circumstances had changed for the better since the prior hearings; the prior transcripts pertained to judicial findings deciding the allegations by the same circuit court; the transcripts were identified, moved into evidence, and made a part of the record; and the circuit court independently analyzed the evidence before it and made its own conclusion.[1] Illustra-

---

1. For analyses of the appropriate invocation of judicial notice, *see TT. v. State Department of Human Resources,* 796 So.2d 365, 367–68 (Ala.Civ. App.2000)("We note that the trial court is allowed to take judicial knowledge of all previous proceedings and that it could consider the prior matters and is not required to forget the past."); *In Re J.M.C.; N.C.,* 741 A.2d 418, 424 (D.C.1999)("[i]n appropriate cases, a judge may take judicial notice of the contents of court records in a related prior proceeding. This is particularly true where, as in this case, the interested parent was a party to and was represented by counsel in the prior neglect proceeding."); *In re J.P.,* 316 Ill.App.3d 652, 249 Ill.Dec. 974,

tive of the precepts expounded in footnote one is *In the*

737 N.E.2d 364, 372 (2000)("[a] trial court should only take judicial notice of those portions of the underlying court file that have been proffered by the State and to which the respondent is given an opportunity to object.") *In the Interest of J.L.W.*, 570 N.W.2d 778, 780 (Iowa Ct.App.1997)(In a termination proceeding, a court may judicially notice exhibits which were part of the prior child in need of assistance proceeding. The papers must be marked, identified, and made a part of the record."); *In the Interest of T.C., N.C., and C.C.*, 492 N.W.2d 425, 429 (Iowa 1992)("The juvenile court was authorized to judicially notice the pleadings and exhibits from the previous child in need of assistance proceeding.") *In the Interest of H.R.K., R.M.A.C., and R.L.C.*, 433 N.W.2d 46, 48 (Iowa Ct.App.1988)("[i]t is permissible for a trial court ... [in a] termination proceeding to judicially notice the prior CHINA case, *including* the evidence ..."); *In re Scott S.*, 775 A.2d 1144, 1149–50 (Me.2001)("We first address the parent's contention that the court should not have [taken judicial notice of] the findings of fact and conclusions of law previously entered by a different judge at the jeopardy and judicial review hearings. The parents argue that because the judge could not consider the evidence presented at those former hearings, he also could not consider the findings of fact and conclusions of law reached at those prior hearings. That contention is simply wrong ... A judge may take judicial notice of any matter of record when that matter is relevant to the proceedings at hand ... [but] it must independently assess all facts presented."); *In the Interest of C.M.W.*, 813 S.W.2d 331, 333 (Mo.Ct.App.1991)(judicial notice of prior hearings appropriate where, at prior hearings, mother was represented by counsel, "had every opportunity to refute, impeach or explain the evidence against her," and the records the court considered "were recorded court entries.") *In the Matter of K.C.H.*, 316 Mont. 13, 68 P.3d 788, 790–91 (2003)(district court did not err in taking judicial notice of mother's prior termination proceeding); *In re Interest of Ty M. and Devon M.*, 265 Neb. 150, 655 N.W.2d 672, 690 (2003)(juvenile court may take judicial notice of its own proceedings and judgments closely related to current proceeding "where the same matters have already been considered and determined.") *In the Matter of the Parental Rights to KLS*, 94 P.3d 1025, 1034 (Wyo.2004)("[c]ourt may take judicial of its own records in cases closely related to the one before it."). *See also, Lerner v. Lerner Corp.*, 132 Md.App. 32, 40, 750 A.2d 709 (2000)("In McCormick's treatise on evidence, it is said to be 'settled, of course, that the courts, trial and appellate, take notice of their own respective records in the present litigation, both as to the matters occurring in the immediate trial, and in the previous trials and hearings.' "). *Cf. In the Matter of Richard*, 128 Md.App. 71, 77, 736 A.2d 1121 (1999)(although not raised on appeal and other evidence was presented, trial judge took judicial notice of prior court records presided over by a different judge pertaining to the current case); *In re Michael G.*, 107 Md.App. 257, 262, 667 A.2d 956 (1995) (although issue not on appeal, "master took judicial notice of a prior CINA case" she presided over concerning the same child.).

*Interest of D.T.*, 667 N.W.2d 694, 697–99 (S.D.2003):

> Upon the State's motion, the trial court took judicial notice of the fact that both Mother and Father had their rights to other children terminated for abuse and neglect ... In its conclusions of law the [trial] court stated, "based on the prior abuse and neglect cases and the pattern of abuse and neglect demonstrated by both parents in those cases, D.T., Jr., is an abused and neglected child." ... It is undisputed that the child was adjudicated abused and neglected based on the history of abuse and neglect demonstrated by parents toward their other children ... Father asserts that the legislature did not intend to allow courts to take judicial notice of prior terminations during the adjudicatory phase of the proceedings ... There is nothing in the statute that indicates that it was intended to limit the trial court's discretion in determining whether and when to take judicial notice of prior terminations ... Father's assertion that case law does not permit the trial court to take judicial notice of prior terminations at the adjudicatory phase is equally unavailing. It is well settled that trial courts are permitted to take judicial notice of prior abuse and neglect adjudications ... This Court has upheld findings of abuse and neglect predicated upon evidence indicating potential harm to the child ... Finally, if the Court were to accept Father's argument that judicial notice of prior terminations may only be taken during the dispositional phase, the best interest of the children involved would not be served.

The hearing judge concluded, based on the transcript and Petition concerning the prior conditions, the only evidence before him, arguments by counsel, and the fact that the prior conditions have not since been remedied, Shirah was a CINA. Having elected to proceed as she did, appellant now wishes to challenge the manner in which the circuit court conducted the hearing. Her claim may have had merit had not the circuit court afforded her the option of presenting her witnesses and a defense.

A summary proceeding in which the State merely submits a prior record and parental rights are thereby abrogated with-

out giving the parties the opportunity to present additional evidence would not comport with the precepts iterated in *Wolinski, supra.* Here, the circuit court provided appellant and the State with an opportunity to present new evidence at each hearing. Bearing in mind that the circumstances of the parties can improve over time, a parent should not automatically lose his or her parental rights in a perfunctory proceeding. Where use of a prior record is contemplated, the parties should be permitted to present evidence demonstrating that circumstances have improved, as the hearing judge did in this case. The opportunity to present evidence of changed circumstances must be afforded to a parent although appellant did not avail herself of that opportunity in this case.

 With that said, the merits of Shirah's case do not focus on whether there was actual harm to her, but rather, like Madeline's situation, based on the prior conduct of appellant, whether her newborn child is at a "substantial risk of harm," which would mandate that the child be removed from the parent. *Andrew A.,* 149 Md.App. at 419, 815 A.2d 931; *William B.,* 73 Md.App. at 72–73, 533 A.2d 16. We must determine whether appellant's "ability to care for the needs of one child is probative of [her] ability to care for other children in the family." *William B.,* 73 Md.App. at 77, 533 A.2d 16. The child may be considered "neglected" before actual harm occurs, as long as there is "fear of harm" in the future based on "hard evidence" and not merely a "gut reaction." *Id.* at 78, 533 A.2d 16 (quoting *In re Jertrude O.,* 56 Md.App. 83, 100, 466 A.2d 885 (1983)).

There was legally sufficient evidence to support the hearing judge's conclusion. Our review of the record does not indicate that the circuit court was clearly erroneous in its fact-finding. Md. Rule 8–131(c). We, therefore, affirm the decision of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**