*In Re: B.Cd. & B.Cb.*, No. 2293, September Term 2024. Opinion by Woodward, J.

**CINA STATUTE – NEGLECT FINDING – ABANDONMENT OF NEWBORN UNDER SAFE HAVEN ACT CONSTITUTES NEGLECT**

**SAFE HAVEN ACT – STATUTORY INTERPRETATION – LANGUAGE OF ACT GRANTING IMMUNITY FROM "CIVIL LIABILITY" – ACT'S IMMUNITY DOES NOT PRECLUDE FINDING OF "NEGLECT" UNDER CINA STATUTE**

Mother left her four-day-old twin boys ("Twins") at a hospital with the express direction that they be placed out of her care under the Safe Haven Act. Mother also declined to give her name. The local department was notified by the hospital and took custody of the Twins upon discharge. The department initiated proceedings in juvenile court to have the Twins found to be children in need of assistance ("CINA"). Having a change of heart, Mother appeared at the adjudicatory hearing on the department's CINA petition. She argued that her actions did not constitute neglect under the CINA statute and, even if they did, the Safe Haven Act's immunity "from civil liability" precluded a finding of neglect. The juvenile court rejected Mother's arguments and after a disposition hearing, found the Twins to be CINA. Mother noted a timely appeal.

**Held:** Affirmed.

Enacted in 2002, the Safe Haven Act has the purpose of preventing newborn deaths when parents abandon newborn infants in public places. The Act provides, *inter alia*, that a person who leaves an unharmed newborn at a designated facility within 60 days after birth without an expressed intent to return "shall be immune from civil liability or criminal prosecution for the act." Under the regulations adopted by the Secretary of the Department of Human Services, the local department of social services is required to take custody of the newborn and institute proceedings to have the child declared a child in need of assistance ("CINA"). Under the circumstances of a Safe Haven case, the only legal basis under the CINA statute for the juvenile court to declare the newborn to be a CINA is to find that the newborn "has been neglected."

In the appeal, the Appellate Court addressed two issues of first impression: (1) whether the juvenile court erred by finding that Mother's actions constituted "neglect" under the CINA statute; and (2) whether the juvenile court erred by holding that the immunity provision of the Safe Haven Act did not preclude a finding of "neglect" under the CINA statute. On the first issue, the Court followed the teachings of *Doe v. Allegany Cnty. Dep't of Soc. Servs.*, 205 Md. App. 47 (2012). The Court concluded that the Twins were neglected under the CINA statute, not when Mother left them at the hospital, but when she failed and refused to make herself available to render proper care and attention to the Twins at the time that

they were ready for discharge from the hospital. Simply stated, Mother abandoned the Twins.

On the second issue, the Court conducted an extensive statutory interpretation analysis of the Safe Haven Act. Among other things, the Court noted that there is no definition in the Act of "civil liability," nor is there any mention of immunity from "civil liability" anywhere in the Act's legislative history. Also, the regulations adopted by the Secretary under the Act clearly contemplate the local department assuming the care and custody of the newborn under the CINA statute. Finally, and most importantly, the Court determined that if the language of the Safe Haven Act granting immunity from "civil liability" preludes a CINA neglect finding, an absurd result would follow. The local department would have no legal authority to provide the care, protection, safety, development, and placement or reunification required by the CINA statute. Mother advanced several alternatives to the CINA statutory scheme, none of which, the Court concluded, either existed or were viable options.

Circuit Court for Anne Arundel County
Case No.: C-02-JV-24-000463
Case No.: C-02-JV-24-000464

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2293

September Term, 2024

_____

IN RE: B.CD. & B.CB.

_____

Beachley,
Zic,
Woodward, Patrick L.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Woodward, J.

_____

Filed: August 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Ms. C. ("Mother"), appellant, appeals from the orders of the Circuit Court for Anne Arundel County, sitting as the juvenile court, (1) finding her children, B.Cd. and B.Cb., (collectively, "the Twins"), to be Children in Need of Assistance ("CINA") under Courts and Judicial Proceedings Article ("CJP") §§ 3-801, *et seq.* ("CINA Statute"), and (2) committing the Twins to the custody of the Anne Arundel Department of Social Services (the "Department"), appellee.[1] In accordance with CJP § 5-641 ("Safe Haven Act" or "Act"), Mother left the Twins as "unharmed newborns" at Baltimore Washington Medical Center ("BWMC"), a "designated facility," without any expressed intent to return for them. On appeal, Mother presents two questions for our review, which we have rephased for clarity:

1. Did the juvenile court err by finding "neglect" under the CINA Statute when Mother left the Twins at a hospital in compliance with the provisions of the Safe Haven Act?

2. Did the juvenile court err by holding that the immunity provision of the Safe Haven Act did not preclude a finding of "neglect" under the CINA Statute?[2]

For the reasons set forth below, we shall affirm the orders of the circuit court.

---

[1] Mr. S., the father of the Twins, noted a timely appeal of the circuit court orders, but did not file a brief in this Court and thus abandoned his appeal. *See* Md. Rules 8-502(d) & 602(c)(5).

[2] In her opening brief, Mother states the questions presented on appeal as follows:

1. Did the Department meet its burden of establishing by a preponderance of the evidence that a mother who made a safe care plan for her unharmed newborns committed neglect?

2. Does the Safe Haven Program's immunity from civil liability exclude a CINA finding?

## BACKGROUND

Mother gave birth to the Twins on September 12, 2024. Mother was twenty-three years old and lived with her mother and her two other children. On September 16, 2024, four days after the Twins' birth, Mother brought the Twins to BWMC and left them in the care of BWMC staff. Mother gave the staff a note regarding the Twins' medical information and birth, which had occurred at a different hospital. Mother declined to give her name and told the staff that she wanted the Twins placed out of her care under the Safe Haven Act.

The Safe Haven Act provides, in relevant part, that

> [a] person who leaves an unharmed newborn with a responsible adult or at a designated facility within 60 days after the birth of the newborn, as determined within a reasonable degree of medical certainty, and does not express an intent to return for the newborn shall be immune from civil liability or criminal prosecution for the act.

CJP § 5-641(b)(1).

BWMC notified the Department regarding the Twins on September 16. A BWMC pediatrician determined that the Twins were "healthy," with "no medical concerns," and that they were ready to be discharged on September 17.

On September 17, 2024, the Department held a Family Team Decision Meeting and determined that the Twins had to be placed in "out-of-home care" to ensure their safety. The Department took custody of the Twins on September 17 and placed them in an approved foster home.

On September 18, the Department filed a CINA petition with Request for Shelter Care ("the CINA Petition") for each Twin in the Circuit Court for Anne Arundel County,

2

sitting as the juvenile court. A magistrate held a shelter care hearing that same day. The identities of the parents were unknown at the time, and the Department was not able to notify them, but the Twins' attorney, case worker, and a Department attorney were present for the hearing. Following the recommendations of the magistrate, the circuit court found that it was "contrary to the [Twins'] welfare to remain in the home of Mother . . . because the following circumstances exist: The mother left the four-day old [Twins] at BWMC and requested placement under the safe haven for newborns statute. The identities of mother and father are unknown and there are no known relatives who can care for the [Twins]." The court granted an Order of Shelter Care that placed the Twins in temporary custody of the Department with temporary limited guardianship and set an adjudicatory hearing for October 18, 2024.

On September 19, 2024, the Department received a call from the Twins' maternal grandmother ("Grandmother"). Grandmother explained that Mother had surrendered the Twins due to concerns of domestic violence from the Twins' father, Mr. S. ("Father"). Mother spoke to the Department on that call and stated that she did not want to disclose her name due to safety concerns with Father. Mother stated that she wanted the Twins to be adopted by a "friend of a friend" of Grandmother and that she invoked the Safe Haven Act because she was worried that the adoption would not go through. Based on the information provided by Grandmother, the Department was able to learn Mother's name.

The Department met with Mother and Grandmother on October 4, 2024. At that meeting Mother identified Father as the putative father of the Twins and continued to state that he had been abusive towards her. On October 9, 2024, Mother told the Department

3

that she would like to reunify with the Twins instead of having them adopted. The Department filed an amended CINA Petition with a Request for Shelter Care on October 17, 2024. In the amended Petition, the Department stated that it had learned the names of Mother, as the putative mother of the Twins, and Father as the putative father of the Twins, but DNA testing for maternity and paternity of the Twins had not been completed.

An adjudicatory hearing was held on October 18, 2024, before a magistrate. An adjudicatory hearing "determine[s] whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true." CJP § 3-801(c). Prior to the hearing on October 15, 2024, the Department filed with the court a report detailing its efforts to locate the parents, identify relative or non-relative resources, and protect the physical health, safety, and welfare of the Twins. The report recommended that the court find the Twins to be CINA and that the court grant custody of the Twins to the Department for out-of-home placement.

Mother and Father were not present at the adjudicatory hearing, but the Twins' attorney, a case worker, and a Department attorney were present. The magistrate found that the Twins were "neglected" under the CINA Statute. The magistrate stated:

> There are no confirmed parents of the [Twins]. The putative mother is unwilling to provide proper care and attention to the [Twins] and the [Twins'] needs as she abandoned the [Twins] at a hospital and provided no information about the father of the [Twins].

The magistrate recommended that the disposition hearing be deferred to November 15, 2024, and that the Twins continue in shelter care for their safety. The circuit court followed the magistrate's recommendations and ordered that the Shelter Care Order

4

continue until the conclusion of the disposition hearing scheduled on November 15, 2024. A disposition hearing determines "(1) [w]hether a child is in need of assistance; and (2) [i]f so, the nature of the court's intervention to protect the child's health, safety, and well-being." CJP § 3-801(m).

On November 15, 2024, the Department filed an Addendum to its October 15 report. The Addendum stated that DNA testing had been completed and that Mother was identified as the mother of the Twins and Father as the father of the Twins. The report recommended that the circuit court find the Twins to be CINA, and that the court grant custody to Father, with supervised weekly visits for Mother, and award the Department an Order of Protective Supervision.

Mother and Father were both present at the disposition hearing on November 15, 2024. Father and the Twins' counsel agreed with the Department's recommendations. Mother stated that she had changed her mind about placing the Twins for adoption and wanted them returned to her. The magistrate found the Twins to be CINA but declined to follow the Department's recommendation of placing the Twins with Father. The magistrate explained that she was concerned about the evidence of Father's domestic violence and criminal history of assault. The magistrate stated that there was insufficient evidence to find that the Father was a fit and proper person to safely care for the Twins. The magistrate recommended, among other things, that the circuit court find the Twins to be CINA and that the Twins be placed in the custody of the Department for out-of-home placement. Mother and Father then filed timely exceptions to the magistrate's adjudicatory and disposition recommendations.

5

A *de novo* adjudicatory and disposition hearing was held on January 15, 2025, before a circuit court judge. The only witness to testify at the hearing was the Department's case worker, Ashley Argyle. Ms. Argyle testified about the events occurring after BWMC notified the Department of the Twins on September 16, 2024, including the efforts to locate, identify, and confirm Mother and Father as parents of the Twins. The DNA results and birth certificates for the Twins were introduced into evidence.

At the conclusion of the evidence, the Department argued that, although the Safe Haven Act protected Mother from civil liability, the Act did not protect Mother from a finding of neglect because CINA hearings are "non-punitive." The Department asserted that Mother "neglected [the Twins] by abandoning them at the hospital. And so we are asking the [c]ourt to make a finding that [the Twins] were in fact neglected which would then allow us to proceed to the determination of whether or not they are CINA and whether or not either parent would be able to care for them at this time." Counsel for the Twins contended that both Mother and Father were neglectful because "[d]uring the whole shelter period, no parent came forward to care for the child. So therefore the [Twins] have been neglected."

On the other hand, Mother argued that her actions did not rise to the level of neglect under the CINA Statute. The CINA Statute defines "neglect," in relevant part, as "the leaving of a child unattended or other failure to give proper care and attention to a child by any parent . . . under circumstances that indicate [] that the child's health or welfare is

harmed or placed at substantial risk of harm[.]" CJP § 3-801(t)(1)[3]. According to Mother, her actions were not neglectful, because she did not leave the Twins unattended, and gave the Twins proper care and attention by dropping them off at a designated facility under the Safe Haven Act. Furthermore, Mother claimed that the immunity from civil liability under the Safe Haven Act precludes a finding of neglect because the finding would have "immediate as well as collateral" consequences.

The juvenile court found that Mother's actions constituted "neglect" under the CINA Statute and held that the Safe Haven Act did not preclude such finding. The court reasoned, in relevant part:

> And candidly I just find it nonsensical to find that the Safe [Haven Act] would prevent a CINA case. Because what if the party here had somehow absolutely never, never found the parents. I think there could be an argument that it would be like a boat without any wind. I mean, I think there could be argument and an argument could be made ten years later. And to me that is just nonsensical.

At the disposition hearing, held right after the adjudicatory hearing, the Department introduced evidence that Mother had accused Father of violence against her and her older children. Father denied the allegations and adduced evidence that he had been participating in services regarding parenting, anger management, and mental health. Mother requested that the Twins be placed in Father's custody pursuant to CJP § 3-819(e), which states that if the allegations are sustained against only one parent, the juvenile court can place the

---

[3] Effective October 1, 2024, the General Assembly amended CJP § 3-801 to redesignate, without change, CJP § 3-801(s) as CJP § 3-801(t). Although Mother's act of leaving the Twins at BWMC occurred before October 1, 2024, we will refer to the current subsection of the "neglect" definition for clarity.

child in the custody of the other parent. On January 16, 2025, the juvenile court found the Twins to be CINA and granted the Department custody of the Twins for out-of-home placement. Orders to such effect were filed on January 17, 2025. This timely appeal followed.

## STANDARD OF REVIEW

> This Court reviews CINA determinations utilizing three interrelated standards of review. *In re Yve S.*, 373 Md. 551, 586. (2003). Factual findings by the juvenile court are reviewed for clear error. *In re Yve S.*, 373 Md. at 586. Matters of law are reviewed without deference to the juvenile court. *Id.* Ultimate conclusions of law and fact, when based upon "sound legal principles" and "factual findings that are not clearly erroneous," are reviewed under an abuse of discretion standard. *Id.*

*In re: T.K.*, 480 Md. 122, 143 (2022) (cleaned up).

For determinations involving mixed questions of law and fact "we will affirm the trial court's judgment when we cannot say that its evidentiary findings were clearly erroneous, and we find no error in that court's application of the law." *Fischbach v. Fischbach*, 187 Md. App. 61, 88 (2009) (citation omitted).

"Statutory interpretation is a question of law. *In re S.K.*, 466 Md. 31, 42 (2019). We therefore 'review the juvenile court's decision without deference, *i.e.*, *de novo*.' *In re M.P.*, 487 Md. 53, 84 (2024)." *In re: K.K.*, ___ Md. App. ___ *5, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025) (cleaned up).

## DISCUSSION

I.    The Law

      A. CINA Statute

8

In *In re M.Z.*, 490 Md. 140, 143-44 (2025), the Supreme Court of Maryland stated that

> [t]he purposes of the CINA statute, among other things, are "[t]o provide for the care, protection, safety, and mental and physical development of any child coming within the provisions [of the CINA statute]" and "[t]o conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare[.]" Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-802(a)(1), (3).

The procedures governing CINA cases are set forth in CJP §§ 3-801, *et seq.*, and Maryland Rules 11-201, *et seq.* Under CJP § 3-801(f) a CINA means a child who requires court intervention because:

> (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

"Neglect" is defined, under the CJP § 3-801(t)(1), as

> the leaving of a child unattended or other failure to give proper care and attention to a child by any parent or individual who has permanent or temporary care or custody or responsibility for supervision of the child under circumstances that indicate:

>> (i) That the child's health or welfare is harmed or placed at substantial risk of harm; or

>> (ii) That the child has suffered mental injury or been placed at substantial risk of mental injury.

If the Department believes a child may be a child in need of assistance, the Department must file a CINA petition to determine if the court has jurisdiction. *In re: T.K.*, 480 Md. at 134. A CINA petition must present facts that support the allegation that the child is in need of assistance. *Id.*; CJP § 3-809(a), § 3-811(a)(1).

9

> Once a petition has been filed, the juvenile court may order the local department to conduct a study concerning the child, the child's family, the child's environment, and other matters relevant to the case. CJ[P] § 3-816(a). As a part of a study, the court may order that the child or any parent or guardian be examined by a physician, psychiatrist, psychologist, or other professionally qualified person.

*In re: O.P.*, 470 Md. 225, 236 (2020).

At the outset, a CINA case generally proceeds in two phases: the adjudicatory hearing and the disposition hearing. *In re: T.K.*, 480 Md. at 135. First, the juvenile court must hold an adjudicatory hearing "to determine whether the allegations in the [CINA] petition, other than the allegation that the child requires the court's intervention, are true." *Id.* (quoting CJP § 3-801(c)). In other words, the Department must prove that the child "has been abused, has been neglected, has a developmental disability, or has a mental disorder." CJP § 3-801(f)(1). The Department's burden of proof is by a preponderance of the evidence. CJP § 3-801(c). Failure of the Department to prove its case at the adjudicatory hearing will result in the dismissal of the CINA petition. *See* CJP § 3-819(a)(1).

Second, after the adjudicatory hearing, if the case is not dismissed, the juvenile court must hold a disposition hearing to determine if the child is, in fact, a CINA. *In re: T.K.*, 480 Md. at 135. For the child to be a CINA, the court must find that the "child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and to that child's needs." CJP § 3-801(f)(2). At least ten days before the disposition hearing, the Department shall provide a written report to the court and all parties involved. CJP § 3-826. If the court finds the child is in need of assistance, the court can: "(1) 'Not change the child's custody status;' or (2) 'Commit the child on terms the court considers

10

appropriate to the custody of' a parent, a relative or other individual, a local department of social services, or the Maryland Department of Health." *In re: T.K.*, 480 Md. at 135 (quoting CJP § 3-819(b)(1)(iii)). If the court finds the child is not in need of assistance then it must "'except as provided in subsection (e) of this section, dismiss the case.'" *Id.* (quoting CJP § 3-819(b)(1)(i)). Subsection (e) provides:

> If the allegations in the petition are sustained against only one parent of a child, and there is another parent available who is able and willing to care for the child, the court may not find that the child is a child in need of assistance, but, before dismissing the case, the court may award custody to the other parent.

*Id.* at 136 (quoting § 3-819(e)).

If the juvenile court makes a CINA finding, the Department must develop a permanency plan "'consistent with the best interests of the child.'" *In re M.Z.*, 490 Md. at 145 (quoting CJP § 3-823(e)(1)(i)). A permanency plan is "a plan specifying where and with whom the child shall live, and the proposed legal relationship between the child and the permanent caretaker or caretakers." COMAR 07.02.11.03B(39). Maryland law presumes the child's best interest is reunification with their natural parents; therefore, reunification is a priority in the permanency plan. *In re M.Z.*, 490 Md. at 145-46; *In re Blessen H.*, 392 Md. 684, 696 (2006); *In re Yve S.*, 373 Md. 551, 582 (2003).

> Regarding the permanency plan, our Supreme Court has observed:
>
> The permanency plan may be decided, to the extent consistent with the child's best interest, in a "descending order of priority:" (1) reunification with a parent or guardian; (2) placement with a relative for adoption or custody and guardianship; (3) adoption by a nonrelative; (4) custody and guardianship by a nonrelative; or (5) for children at least sixteen-years-old, another planned permanent living arrangement. *Id.* § 3-823(e)(1). The juvenile court must review the permanency plan at a review hearing "at least

11

every [six] months" until the child is no longer committed to the Department. *Id.* § 3-823(h)(1)(i).

***

In determining the permanency plan, the court is required to consider the statutory factors set forth in Section 5-525(f)(1) of the Family Law Article ("FL") and to give "primary consideration" to the "best interests of the child[.]" CJP § 3-823(e)(2); FL § 5-525(f)(1). The Department and the juvenile court must make "[e]very reasonable effort" to permanently place the child within twenty-four months. CJP § 3-823(h)(5).

*In re M.Z.*, 490 Md. at 146-47.

An additional component of certain CINA cases is the child's need for emergency shelter care prior to the disposition hearing. *In re: O.P.*, 470 Md. at 237.

Under certain circumstances, the CINA statute authorizes the placement of a child alleged to be a CINA in emergency shelter care prior to disposition of the CINA petition. CJ § 3-815(a). Shelter care is defined as "a temporary placement of a child outside of the home at any time before disposition." CJ § 3-801(bb). Shelter care is not a component of every CINA case. Rather, it involves a separate proceeding in which the juvenile court decides whether to authorize interim protection for a child who may be at risk in the home while the CINA petition is pending.

*Id.*

The Department may place the child in emergency shelter care either before or after filing of a CINA petition and without a court order. *Id.* If a child is placed in emergency shelter care, the local department must file a shelter care petition with the court the next day the court is sitting to authorize the shelter care. *Id.* at 238; CJP § 3-815(c)(1). "The juvenile court must then hold a shelter care hearing, no later than the next day on which court is in session, unless good cause is shown, to determine whether temporary placement of the child outside the home for up to 30 days is warranted." *Id.* at 239; CJP § 3-815(c)(2).

12

The local department must also give reasonable notice to the child's parents, guardians, or relatives, if possible. *Id.* at 239; CJP § 3-815(c)(3).

Shelter care cannot be granted indefinitely, as explained by our Supreme Court in *In re: O.P.*; it can only be granted for a limited time.

> Even if the juvenile court concludes that the criteria in CJ [§ 3-]815(d) are satisfied and orders shelter care to continue, that extension is limited. The court may not order shelter care to continue for more than 30 days. CJ § 3-815(c)(4). Moreover, if the court orders shelter care to continue, it must hold the adjudicatory hearing on the CINA petition before the expiration of that 30-day period. Maryland Rule 11-114(b)(2). If the court does not hold the adjudicatory hearing within that 30-day period, the child is to be released from shelter care. *Id.* If the adjudicatory hearing is held within that period and the court finds at that hearing that continued shelter care is needed to ensure the safety of the child, it may extend shelter care for up to an additional 30 days. CJ § 3-815(c)(4). As noted above, that hearing is conducted under the rules of evidence and a preponderance standard applies. CJ § 3-817.

470 Md. at 240.

During an adjudicatory, disposition, and shelter care hearing, the juvenile court must make a finding as to whether the Department "made reasonable efforts to prevent placement of the child into the local department's custody." CJP § 3-816.1(b)(1). The court must also hold review hearings within 6 months after the filing of the CINA petition and every 6 months thereafter. At a review hearing, the juvenile court shall:

(i) Evaluate the safety of the child;

(ii) Determine the continuing necessity for and appropriateness of any out-of-home placement;

(iii) Determine the appropriateness of and extent of compliance with the case plan for the child;

13

(iv) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating the court's jurisdiction; and

(v) Project a reasonable date by which the child may be returned to and safely maintained in the home or placed for adoption or under a legal guardianship.

CJP § 3-816.2(a)(2).

## B. Safe Haven Act

In 2002 the Maryland General Assembly enacted the Maryland Safe Haven Act.

Laws of 2002, Chapter 441. The Act provided in its entirety:

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

### Article—Courts and Judicial Proceedings

§ 5–641

(a)(1) A person who leaves an unharmed newborn with a responsible adult within 3 days after the birth of the newborn, as determined within a reasonable degree of medical certainty, and does not express an intent to return for the newborn shall be immune from civil liability or criminal prosecution for the act.

(2) If the person leaving a newborn under this subsection is not the mother of the newborn, the person shall have the approval of the mother to do so.

(b)(1) A person with whom a newborn is left under the circumstances described in subsection (a) of this section as soon as reasonably possible shall take the newborn to a hospital or other facility designated by the Secretary of human resources by regulation.

(2) A hospital or other designated facility that accepts a newborn under this subsection shall notify the local department of social services within 24 hours after accepting the newborn.

(c) A responsible adult and a hospital or other designated facility that accepts a newborn under this section and an employee or agent of the hospital or facility shall be immune from civil liability or criminal prosecution for good

14

faith actions taken related to the acceptance of or medical treatment or care of the newborn unless injury to the newborn was caused by gross negligence or willful or wanton misconduct.

(d) The Secretary of human resources shall adopt regulations to implement the provisions of this section.

SECTION 2. AND BE IT FURTHER ENACTED, That if any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act which can be given effect without the invalid provision or application, and for this purpose the provisions of this Act are declared severable.

SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2002.

Over the subsequent years, the General Assembly passed amendments to the Safe Haven Act that included extending the time for relinquishing an unharmed newborn from three days to sixty days after birth, defining a "designated facility," permitting the receipt of a newborn by a designated facility in a newborn safety device, and establishing a public information program. *See* CJP § 5-641(b)(1), (a)(2), (c)(3), and (e). The four paragraphs, and subparagraphs of the original act, however, remain essentially the same. Such provisions appear in the current law as follows:

(b)(1) A person who leaves an unharmed newborn with a responsible adult or at a designated facility within 60 days after the birth of the newborn, as determined within a reasonable degree of medical certainty, and does not express an intent to return for the newborn shall be immune from civil liability or criminal prosecution for the act.

(2) If the person leaving a newborn under this subsection is not the mother of the newborn, the person must have the approval of the mother to do so.

15

(c)(1) A person with whom a newborn is left under the circumstances described in subsection (b) of this section as soon as reasonably possible shall take the newborn to a designated facility.

> (2) A designated facility that accepts a newborn under this subsection shall notify the local department of social services within 24 hours after accepting the newborn.

\*\*\*

(d) A responsible adult and a designated facility that accepts a newborn under this section and an employee or agent of the facility shall be immune from civil liability or criminal prosecution for good faith actions taken related to the acceptance of or medical treatment or care of the newborn unless injury to the newborn was caused by gross negligence or willful or wanton misconduct.

\*\*\*

(f) The Secretary of Human Services shall adopt regulations to implement the provisions of this section.

CJP § 5-641.

According to paragraph (d) of the original act, the Secretary of Human Resources[4] was directed to "adopt regulations to implement the provisions of this section." CJP § 5-641(d). The Secretary adopted regulations under the Safe Haven Act in 2003 at COMAR 07.02.27.01-.03. Relevant to the instant appeal are the following provisions of COMAR 07.02.27.03:

> C. The hospital or other designated facility that accepts a newborn shall notify the LDSS [local department of social services] within 24 hours after accepting the newborn.

---

[4] The Secretary of Human Resources is now the Secretary of Human Services. House Bill 103, 2017 Leg., 437th Sess. (Md. 2017).

D. The LDSS in the jurisdiction where the hospital is located shall take responsibility of the newborn when medically ready for discharge under an OSC [Order of Shelter Care].

E. A CINA petition shall be filed by the LDSS on behalf of the abandoned newborn in the jurisdiction where the hospital is located in conjunction with the request for an OSC.

F. A Child Protective Services investigation shall be initiated if the mother, father, or relative of the newborn comes forth to identify the newborn and requests that the newborn be placed in the individual's care.

G. The child shall remain in the care of the LDSS under an OSC with a CINA finding and commitment to the LDSS pending the outcome of the investigation.

## C. Statutory Interpretation

The primary purpose of statutory interpretation is "to ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *Vanderpool v. State*, 261 Md. App. 163, 180 (2024) (citation omitted). Our analysis begins with the text of the statute as "[w]e assume that the legislature's intent is expressed in the statutory language[.]" *In re: K.K.*, ___ Md. App. ___ *5, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025) (citation omitted). When analyzing the statute, we look to the "plain meaning of the language of the statute[.]" *Vanderpool*, 261 Md. App. at 180 (citation omitted). We do not view the text in isolation, but instead "within the context of the statutory scheme to which it belongs." *In re: K.K.*, ___ Md. App. ___ *5, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025) (citation omitted). This "context may include the statute's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Vanderpool*, 261 Md. App. at 181 (citation

17

omitted). When reviewing a statute, we "take the [statutory] language as we find it, neither adding to nor deleting from it; we avoid forced or subtle interpretations; and we avoid constructions that would negate portions of the language or render them meaningless." *In re: K.K.*, ___ Md. App. ___ *6, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025) (citation omitted).

We must first determine if the statute is ambiguous or unambiguous. "If the meaning of the statute is apparent from the plain language and its context, the statute is unambiguous, and the analysis is complete." *Vanderpool*, 261 Md. App. at 181. A statute is ambiguous if it has more than one "reasonable interpretation[] or because 'the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme[.]'" *Id.* (quoting *State v. Bey*, 452 Md. 255, 266 (2017)).

In order to resolve a statute's ambiguity, we

> search[] for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. Such sources include the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it.

*In re: K.K.*, ___ Md. App. ___ *6, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025) (cleaned up).

Our Supreme Court has repeatedly stated that "the construction placed upon a statute by administrative officials soon after its enactment should not be disregarded except for the strongest and most cogent reasons." *Macke Co. v. Comptroller of the Treasury*, 302 Md. 18, 22 (1984); *Comptroller of Treasury v. M.E. Rockhill, Inc.*, 205 Md. 226, 233 (1954); *Smith v. Higinbothom*, 187 Md. 115, 132 (1946). Further, "where the language of

18

a statute is susceptible of two constructions, a long-continued and unvarying construction applied by administrative officials is strong persuasive influence in determining the judicial construction of the statute[.]" *Smith*, 187 Md. at 132-33. Therefore, in construing a statute we will give great weight to the regulations issued by an administrative agency soon after the enactment of the statute, especially where the legislature directs the agency to adopt regulations to implement the statute's provisions.

Finally, we stated in *In re: K.K.*, ___ Md. App. ___ *6, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025):

> [R]egardless of clarity, every "statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *FC[-]GEN Operations*, 482 Md. at 380 (cleaned up). To that end, "we check our interpretation against the consequences of alternative readings of the text[.]" Turenne, 488 Md. at 286 (cleaned up). If one reading would produce such a result, "we will reject that interpretation in favor of another that does not suffer the same flaw." *Westminster Mgmt.*, 486 Md. at 646; see also *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 170 (2021) (explaining that "it is important to consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical or nonsensical, or that render a statute meaningless")

II. **Did the juvenile court err by finding "neglect" under the CINA Statute when Mother left the Twins at a hospital in compliance with the provisions of the Safe Haven Act?**

   **A. Arguments of the Parties**

Mother argues that by "leav[ing] [] unharmed newborn[s] with a responsible adult or at a designated facility" in accordance with Section 5-641(b)(1) of the Safe Haven Act, she did not place the Twins "at substantial risk of harm," and thus did not neglect them. According to Mother, "a parent does not neglect—does not place a child at substantial risk of harm—by placing them unharmed with a responsible adult or at a designated facility."

19

Mother claims that she "acted exactly in line with the instructions" given by the Safe Haven Program, which was created by the Safe Haven Act, and that her care plan involved bringing the Twins "to a place she was certain they would be cared for and not in a place which posed any risk—much less a 'substantial' risk—to the children's well-being."

Mother points to a New Jersey Supreme Court case, *Div. of Child Prot. & Permanency v. B.P.*, 313 A.3d 905, 908 (N.J. 2024), and a New York Family Court case, *Matter of Doe*, 883 N.Y.S.2d 430, 432 (N.Y. Fam. Ct. 2009), as persuasive authority. Mother contends that these out-of-state cases held that it was not "neglect" for a mother to leave her infant in the care of a hospital. Mother quotes the New Jersey Supreme Court's observation that "'[t]he mother] left [her child] in a hospital where she was undoubtedly well taken care of and her needs were met. Nothing in the facts suggest that [the mother]'s actions impaired [the child] or put [the child] in imminent danger of being impaired while she remained in the safety of the hospital's care.'" *B.P.*, 313 A.3d at 908.

The Department responds that it can take custody of a child only if the juvenile court finds the child to be CINA, and the court cannot make that finding unless the child has been abused, has been neglected, has a developmental disability, or has a mental disorder. The Department points out that, because the newborn must be unharmed when left with a responsible adult or at a designated facility, the court cannot make a finding of "abuse" when the Safe Haven Act is followed. Thus, according to the Department, "absent evidence that a newborn has a 'developmental disability' or a 'mental disorder,' a juvenile court could only find a newborn under the Safe Haven statute to be a CINA on the basis that the newborn had been neglected."

20

The Department asserts that when a child is "no longer allowed to return home," the Department has no choice but to act and take custody of the child. Citing *Doe v. Allegany Cnty. Dep't of Soc. Servs.*, 205 Md. App. 47 (2012), the Department, contends that "this Court's precedent establishes that, as a matter of law, a parent or other caregiver of a child who abandons an otherwise helpless but unharmed child to the custody of a local department of social services has neglected the child." The Department argues that, in the instant case, absent the Department's intervention, the Twins "would have been left completely helpless, unable to provide for their basic sustenance." According to the Department, the Mother's actions thus placed the Twins at substantial risk of harm, and the juvenile court correctly found that the Twins had been neglected.

In her reply brief, Mother contends that the Department's reliance on *Doe v. Allegany Cnty. Dep't of Soc. Servs.*, is misplaced. Mother asserts that unlike in *Doe*, her actions did not result in the Twins being left without care. According to Mother, in *Doe* the parents refused to allow their teenage child to return home after school, and absent the Department's intervention, the teenager would have been left without a safe place to go. Mother argues that in the instant case, she brought the Twins to a hospital knowing that the hospital would provide care. Mother states that "it defies common sense to assert that any hospital would refuse to give 'basic sustenance' to an infant left in its care." Further, Mother claims that unlike the parents in *Doe*, she acted in line with the Department's public and explicit promise that a parent who follows the Safe Haven Program "can safely give up custody of their baby, no questions asked."

Mother also asserts that the Department's argument fails because it

21

makes no distinction between a mother who brings her child to the hospital for care and a mother who actually abandons her child in an unsafe manner, such as leaving her child in an alley. Under the Department's formulation, both mothers have placed their children at substantial risk of harm, both have committed neglect, and both should receive the same penalty: a CINA finding of neglect . . . And that's not right[.]

**B. Analysis**

As previously stated, "neglect" is defined under the CINA statute as the "failure to give proper care and attention to a child by any parent . . . under circumstances that indicate: [] [t]hat the child's health or welfare is . . . placed at substantial risk of harm." CJP § 3-801 (t)(1). The essence of Mother's argument is that she could not have neglected the Twins because she left them "unharmed," within 60 days of their birth, at a designated facility under the Safe Haven Act where they would receive proper care. What Mother overlooks, however, is that when she left the Twins at BWMC, she declined to give her name and told the staff that she wanted the Twins placed out of her care under the Safe Haven Act. As a result, she failed and refused to make herself available to render proper care and attention to the Twins when they were ready for discharge from BWMC. Simply stated, Mother abandoned her children. And, as properly pointed out by the Department, Mother's actions placed the Twins at substantial risk of harm, because but for the Department's intervention, the Twins "would have been left completely helpless, unable to provide for their basic sustenance."

Unlike the out-of-state cases cited by Mother, Maryland law is clear that "a finding of neglect may be based on a substantial risk of harm to the child if the [Department of Social Services] does not take charge of the child." *Doe*, 205 Md. App. at 60. *See Owens*

22

*v. Prince George's Cnty. Dep't of Soc. Servs.*, 182 Md. App. 31, 54-55 (2008); *In re: Nathaniel A.*, 160 Md. App. 581, 601 (2005). Writing for this Court in *Doe*, Judge Stuart Berger observed that "so long as the local [department of social services] (or the equivalent governmental agency) was able to care for a child, it would be nearly impossible to find a child in substantial risk of harm." *Doe*, 205 Md. App. at 60. "[T]he focus should have been on the impact the actions of [the parents] could have had on [the child] had the local department not taken charge of [the child]." *Id.*

Of particular relevance to the instant case is *Doe*. In *Doe*, seventeen-year-old M.C. lived with his aunt and adoptive mother, J.C., and her live-in boyfriend, Doe (collectively, "the parents"). 205 Md. App. at 50. They had lived together for eight years, along with M.C.'s younger brother. *Id.* Five months prior to the incident in question M.C. had been paralyzed from the waist down in a car accident. *Id.* On the morning of the incident, M.C. and Doe got into an argument about how M.C. would get to school, which argument led to a physical altercation. *Id.* at 50-51. Upon arrival at school, M.C. reported the altercation to a school counselor, who, in turn, notified the local department of social services. *Id.* Later that day, a local department officer contacted Doe, and Doe stated that "M.C. was no longer welcome at home" because M.C. would not take his medications, attend counseling, or tend to his hygiene after the accident. *Id.* at 51. The local department officer also spoke with J.C., "who agreed with Doe that M.C. was no longer welcome in their home." *Id.* at 52.

The local department took custody of M.C., placed him in a foster home, and filed a CINA petition. *Id.* At the hearing on the petition, M.C. was found to be a CINA. *Id.* The

local department officer also found that J.C. and Doe were responsible for "indicated neglect" of M.C. under Section 5-701, *et seq.*, of the Family Law Article ("FL").[5] *Id.*

Doe challenged the finding of "indicated neglect" in a contested hearing before an Administrative Law Judge ("ALJ"). *Id.* The ALJ rejected the local department officer's finding of "indicated neglect." *Id.* at 53. The ALJ found that M.C. was never at risk "because there was no gap in custody between the care provided by Doe, J.C., and the local department." *Id.* Upon judicial review, however, the circuit court reversed the ALJ's decision. *Id.* This Court affirmed the circuit court reversal of the ALJ's decision. *Id.* at 60-62.

This Court held that the ALJ's finding of "ruled out child neglect" was "legally incorrect under the undisputed circumstances of this case." *Id.* at 60. Judge Berger wrote for our Court:

> The ALJ based his finding on the actions and abilities of the local department. Instead, the focus should have been on the impact the actions of Doe and J.C. could have had on M.C. had the local department not taken charge of M.C. . . . In short, the actions or capabilities of [Department of Social Services] to take care of a child after an incident occurred are irrelevant in determining whether a child was placed at a substantial risk of harm due to an incident.

*Id.* at 60-61.

In *Doe*, the risk of harm to M.C. was at the time that he was not allowed to return

---

[5] The definition of "neglect" under the Family Law Article is identical in all material respects to the definition of "neglect" under the CINA Statute. *Compare* CJP § 3-801(t)(1) with FL § 5-701(s). "'Indicated' means a finding that there is credible evidence, which has not been satisfactory refuted, that abuse, neglect, or sexual abuse did occur." FL § 5-701(m). These provisions of the Family Law Article regarding child abuse and neglect are in addition to and not in substitution for related provisions in the CINA Statute. FL § 5-703(a); *In re: O.P.*, 470 Md. at 235 n.3.

24

home. *Id.* at 62. The local department officer found that Doe and J.C.'s action "placed M.C.'s welfare at a substantial risk of harm because M.C. had nowhere else to go and he needed extensive attention and medication due to his accident." *Id.* at 59. Therefore, we concluded that by not allowing M.C. to return home, he was "legally placed at substantial risk of harm." *Id.* at 62 (footnote omitted).

Like the parents in *Doe*, who allowed M.C. to attend school where he would receive proper care and attention, Mother left the Twins at a hospital where they would receive proper care and attention. Like the parents in *Doe*, who refused to allow M.C. to return home from school, Mother failed and refused to make herself available for the return of the Twins from the hospital. In both cases, the children's welfare was placed at substantial risk of harm because they had no place to go and needed extensive care and attention. Also, in both cases, the local department had no choice but to act and take custody and care of the children. Following the teachings of *Doe*, we conclude that the Mother's actions placed the Twins' welfare in substantial risk of harm and thus constituted "neglect" under CJP § 3-801(t)(1).

Nevertheless, Mother argues that by allowing a finding of neglect when a mother complies with the requirements of the Safe Haven Act, there is "no distinction between a mother who brings her child to the hospital for care and a mother who actually abandons her child in an unsafe manner, such as leaving her child in an alley." We disagree. The purpose of the Safe Haven Act is "to prevent newborn deaths" that occur when parents abandon newborn infants in public places. *See* Floor Report, House Bill 602, Safe Haven Act, 2002 Leg., 416th Sess. (Md. 2002) at 2. The act of abandoning a newborn in a manner

25

inconsistent with the Safe Haven Act can subject the parent to criminal prosecution. Immunity from such criminal prosecution for those who follow the requirements of the Safe Haven Act is the primary mechanism for protecting the health, safety, and well-being of a newborn. A finding of "neglect" under the CINA Statute does not in any way impede the purpose of the Safe Haven Act. Indeed, as will be discussed in the next section, a finding of "neglect" is necessary for a newborn to be found a CINA and thus necessary for the local department of social services to provide the care, protection, and services required by the CINA statutory scheme.

For the above reasons, this Court holds that Mother's actions in the instant case, to wit, her failure and refusal to make herself available to render proper care and attention to the Twins when they were ready for discharge from the hospital, placed the Twins' welfare at substantial risk of harm. Accordingly, we conclude that the juvenile court did not err by finding that the Mother's actions constituted "neglect" under the CINA Statute. *See* CJP § 3-801(t)(1).

### III. Did the juvenile court err by holding that the immunity provision of the Safe Haven Act did not preclude a finding of "neglect" under the CINA Statute?

#### A. Argument of the Parties

Mother contends that a finding of neglect in a CINA case would violate the Safe Haven Act's immunity "from civil liability." Mother cites to the definition of "liability" from Black's Law Dictionary as "the quality, state, or condition of being legally obligated or accountable." Mother argues that a CINA neglect finding "is a finding that the parent has failed in their obligation of providing appropriate care and attention to a child[,]" and

26

thus is encompassed within the definition of "civil liability."

Mother supports her argument by pointing to the direct and collateral consequences that can flow from a CINA finding. Mother claims that a direct consequence of a CINA action can be the loss of custody of a child and an order to pay support. Collateral consequences of a CINA finding, according to Mother, include (1) the inclusion of the parent on the state's child abuse registry under FL § 5-714, (2) the adverse impact on an individual's qualification to become a foster parent, (3) the ability of a parent to maintain a parental relationship with the other children, and (4) the shifting of the burden of proof to a parent at hearings regarding visitation with or custody of other children under FL § 9-101.

Although in *In re Blessen H.*, 163 Md. App. 1, 15 (2005), our Court characterized CINA hearings as "non-punitive," Mother argues that the "nature" of a CINA hearing does not exclude a CINA finding from being a civil liability. Mother states that "*Blessen* goes on to acknowledge the significant loss to a parent which can follow from a CINA adjudication, saying, '[t]o be sure, a CINA adjudication could lead to an infringement of a parent's important right to raise his or her child.'" *Id.* Mother concludes that the Safe Haven Act's express grant of "immunity from civil liability" encompasses "immunity from a CINA finding."

Mother also argues that a neglect finding would be contrary to the legislative intent of the Safe Haven Act. Citing to the Act's legislative history, Mother contends that the purpose of the Act was "to encourage parents to leave unwanted newborns in a manner that did not endanger the infant's life, with the incentive being immunity from criminal or civil

liability for the act." Mother argues that "[s]ubjecting a parent to a judicial finding of neglect, however, creates a disincentive for a parent to rely on the Safe Haven Act, directly contravening the plain language and intent of the Act."

Furthermore, Mother asserts that if actions under the Safe Haven Act can be considered neglect, then the "statute impermissibly entraps parents into committing neglect." Mother points to a pamphlet from the Department of Human Services about the Safe Haven Act, which states that the Act is designed "to protect you from legal action" and that "turning your unharmed baby over to a Safe Haven location is not against the law." Mother argues that this pamphlet reinforces the notion that invoking the Safe Haven Act is not neglect.[6]

Finally, Mother argues that precluding a CINA neglect finding in a case under the Safe Haven Act will not "prevent a CINA case," as suggested by the juvenile court. According to Mother, the Department can properly take custody of the child under CJP § 3-815(a), which authorizes shelter care. Then, according to Mother, the Department can

---

[6] Mother also contends that by informing parents that they would not be civilly or criminally liable for invoking the Safe Haven Act and then subjecting them to a CINA neglect finding, they would suffer several violations of their constitutional rights, including their rights to due process and "family integrity" under the Fourteenth Amendment of the U.S. Constitution and the Maryland Declaration of Rights, and their right to "reproductive freedom" under Maryland's Right to Reproductive Freedom Amendment. Mother's constitutional questions, however, were not raised in the trial court and thus are not preserved for our review. *See* Md. Rule 8-131(a). But even if raised below, Mother would not prevail. All of the constitutional violations claimed by Mother are based on the premise that the act of leaving an unharmed newborn with a responsible adult or at a designated facility in accordance with the Safe Haven Act constitutes neglect under the CINA Statute. As we have explained above, Mother was neglectful when she failed and refused to make herself available to render proper care and attention to the Twins when they were ready for discharge from BWMC. *See supra* pp. 22, 25, 26.

proceed in one of three ways: (1) if the parents are unknown, the Department can proceed to file a petition for guardianship under FL § 5-313, which can lead to adoption; (2) if the parents consent, the Department can file for guardianship under FL § 5-320(a)(1)(iii)A; and (3) if one or both parents desire custody, the child is returned, as the Department has no legal basis for holding the child.

The Department responds that a CINA finding of neglect does not impose "civil liability" on the parent. The Department cites to the definition of "liability" in Black's Law Dictionary as "[t]he quality, state, or condition of being legally obligated or accountable . . . , enforceable by civil remedy or criminal punishment." According to the Department, Mother has made no showing that the neglect finding by the juvenile court imposed any specific legal responsibility on her enforceable by any civil or criminal remedy. The Department points out that a CINA finding requires a finding of *both* past abuse or neglect and a present inability or unwillingness of both parents to provide proper care. In addition, the Department argues that a CINA neglect finding cannot be affected by what Mother has identified as "collateral consequences," because Mother has not adduced any evidence that she has suffered or will suffer any such consequence.

Regarding legislative intent, the Department argues that the "narrow" purpose of the Safe Haven Act was to "'prevent newborn deaths' that result when parents abandon newborn infants in public places." The Department contends that to effectuate such purpose, the Act provides for (1) immunity from criminal prosecution for desertion of a child or for causing a child to become a CINA, and (2) immunity from civil liability for the "act" of leaving an unharmed newborn without an expressed intention to return, which act

would not be otherwise protected by the common-law doctrine of parent-child immunity. For legislative history, the Department cites to the written testimony of the Counsel to the Office of the Public Defender, who wrote that the Act "'does not change existing CINA law as to the duties and responsibilities of all persons after the baby is delivered to a safe haven.'"

Finally, the Department argues that "it would be an absurd result to interpret [the Act] to render the local department and juvenile courts powerless to protect [] a newborn in a CINA proceeding." The Department points out that a CINA petition for an unharmed newborn cannot proceed unless the child is found to be neglected, and that a guardianship petition suggested by Mother cannot be pursued "absent a judicial finding that the newborn was a CINA." The Department concludes that "[t]he General Assembly did not vest authority in the hospital or another designated facility to assume custody of the child and did not provide a mechanism separate from the CINA proceeding for the local department to assume custody."

In reply, Mother admits that "the legislative history does not establish that the legislature ever explicitly stated that it did not intend for a parent who acted in line with the Safe Haven [P]rogram to receive a neglect finding." But, according to Mother, the legislature, "with absolute clarity . . . intended that parents who act in line with this program incur no 'civil liability' and that this immunity was given in order to encourage a parent . . . . to make a safe care plan for the child—such as bringing the child to a hospital."

In addition, Mother claims that in 2002, when the Safe Haven Act was enacted, a child could have been placed in the guardianship of the Department without a CINA

30

finding of neglect under then FL § 5-313(a)(1). Mother also asserts that there was another mechanism that existed in 2002 that permitted the Department to assume guardianship of a child without a neglect finding. And, according to Mother, that mechanism, which still exists today, is a petition for guardianship of a minor under Section 13-702 of the Estates and Trusts Article.

**B. Analysis**

Our quest to ascertain the intent of the legislature begins with the text of the Safe Haven Act. *In re: K.K.*, ___ Md. App. ___ *5-7, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025). The Act provides that a person who complies with its requirements "shall be immune from civil liability." CJP § 5-641(b)(1). Because the Act does not define the term "civil liability," we look to the "plain meaning of the language[.]" *Vanderpool*, 261 Md. App. at 180. Both Mother and the Department cite to the definition of "liability" in Black's Law Dictionary as "[t]he quality, state, or condition of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment." *Black's Law Dictionary* (12th ed. 2024). But from that definition Mother and the Department arrive at opposite conclusions when applied to the issue presented in the instant appeal. Mother views "civil liability" broadly to include a CINA neglect finding because of the potential adverse direct and collateral consequences of such finding. The Department, on the other hand, takes a narrower approach by suggesting that immunity from "civil liability" simply precludes legal action against the parent by a person on behalf of the newborn for the "act" of abandonment, which would not be precluded by the common-law doctrine of parent-child immunity. We need not resolve this difference of

31

opinion at this time, except to say that the Act's language on immunity from "civil liability" is ambiguous.

In order to resolve the Safe Haven Act's ambiguity, we search for the legislative intent in the history of the Act, including "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it." *In re: K.K.*, ___ Md. App. ___ *6, Nos. 129 & 130, Sept. Term 2024 (June 27, 2025) (citation omitted).[7] Our review of the legislative history of the Safe Haven Act, however, reveals no reference to, or information about, the meaning of immunity from "civil liability." Instead, the Floor Report for House Bill 602 and the Revised Fiscal Note for Senate Bill 3 contain an extensive discussion on the criminal laws in Maryland "related to desertion of a minor child." Floor Report, House Bill 602, Safe Haven Act, 2002 Leg., 416th Sess. (Md. 2002) at 2; Dep't of Legislative Services, Revised Fiscal Note, Senate Bill 3, 2002 Leg., 416th Sess. (Md. 2002).

There is, however, some information in the legislative history about the relationship of the Safe Haven Act and the CINA Statute. The Floor Report and the Revised Fiscal Note referred to the provision of the Safe Haven Act that "[a] hospital or other designated facility must notify the local department of social services within 24 hours after accepting the newborn." *See* CJP § 5-641(c)(2). In a letter from J. Theodore Wieseman, Counsel to the

---

[7] "The legislative sources and documents in a bill file that are most authoritative in any given appeal will vary, depending on the issues presented[.]" *Logan v. Dietz*, 258 Md. App. 629, 669 n.10 (2023) (describing the relative value of documents in a bill file in discerning the "actual legislative purpose").

Office of the Public Defender, to Sen. Walter H. Baker, dated April 2, 2002, Mr. Wieseman

wrote, in relevant part:

> Our second reason for favoring HB 602 over SB 3 is that **the House Bill does not change existing CINA law as to the duties and responsibilities of all persons after the baby is delivered to a safe haven**. SB 3 changes existing law and establishes some new procedures with which we disagree. **After spending the last three years writing and rewriting the complex provisions of our CINA laws, there is no reason to do it again at this time.**[8]

Letter from J. Theodore Wieseman, Counsel to the Office of the Public Defender, to Sen.

Walter H. Baker (Apr. 2, 2002) (on file with Maryland Legislative Services) (emphasis

added). Thus, the legislative history of the Safe Haven Act suggests that once a hospital or

other designated facility notifies the local department of social services that it has accepted

a newborn, the local department will take custody of the child under the authority provided

by the CINA statute.[9]

---

[8] It appears that the change to existing law and the establishment of new procedures, which were objected to by Mr. Wieseman, were stricken from Senate Bill 3 before its adoption by the General Assembly as the Maryland Safe Haven Act. *See* Senate Bill 3, 2002 Leg., 416th Sess. (Md. 2002).

[9] The Bill File for House Bill 602 contains a news article by Joanna Grossman, entitled, "The Adoptability of Abandoned Babies: A Recent New York Case Interprets the State's 'Baby Moses' Law." In the section under "The Mechanics of Using Safe Havens," Ms. Grossman writes:

> Once a baby is left at a safe haven, the primary goal is to provide the infant with medical care, which many of them need desperately. **Ultimately, the baby is turned over to the state's child welfare system, with an eye toward finding a foster or adoptive family for it.** In the meantime, the mother — depending on the law — either is immune from prosecution for abandonment, or has an affirmative defense to raise against such a charge.

In the next stop on our journey through statutory interpretation, we focus on the regulations adopted by the Secretary of Human Resources.[10] In Section 5-641(d),[11] the Act expressly directs the Secretary to "adopt regulations to implement the provisions of this section." In 2003, the Secretary adopted regulations for the Safe Haven Act. COMAR 07.02.27.01-03.

The purpose of the Act "is to provide the mother of a newborn the opportunity to provide a safe abandonment of her newborn[,]" with one of the goals listed as to "[p]rovide for a long-term plan of care of the abandoned newborn." COMAR 07.02.27.01A, B(4). COMAR 07.02.27.03 sets forth the duties of the local department of social services upon being notified that a hospital or other designated facility has accepted a newborn. COMAR 07.02.27.03D-H; *See* CJP § 5-641(c)(2). The local department must "take responsibility of the newborn when medically ready for discharge under an [Order for Shelter Care]." COMAR 07.02.27.03D. The local department shall then file a CINA petition "on behalf of the abandoned newborn . . . in conjunction with the request for an [Order for Shelter Care]." COMAR 07.02.27.03E. If the mother, father, or relative of the newborn comes forth and requests that the newborn be placed in the individual's care, a Child Protective Services investigation shall be initiated, during which time the child shall remain in the care of the local department under an Order of Shelter Care "with a CINA finding and commitment to

---

Joanna Grossman, *The Adoptability of Abandoned Babies: A Recent New York Case Interprets the State's "Baby Moses" Law*, FindLaw, Oct. 9 2001, at 2 (emphasis added).

[10] *See supra* note 4.

[11] Now CJP § 5-641(f).

the [local department of social services]." COMAR 07.02.27.03F, G. All of the above regulations have remained in effect and unchanged since 2003.

It is quite clear from a review of the above regulations that the Secretary interpreted the Safe Haven Act to require the local department of social services to assume the care and custody of a newborn, when medically ready for discharge, under the provisions of the CINA Statute, to include seeking shelter care for an alleged CINA under CJP § 3-815, filing a CINA petition under CJP § 3-809, and pursuing a CINA finding under CJP § 3-801(f). Because the regulations adopted by the Secretary under the Safe Haven Act constitute "a long-continued and unvarying construction applied by administrative officials," they are "strong persuasive influence in determining the judicial construction of the statute." *Smith*, 187 Md. at 133.

Finally, every "statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 380 (2022) (citation omitted). We must "consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical or nonsensical, or that render the statute meaningless." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 170 (2021) (citation omitted). In the instant case, the Department argues that "it would be an absurd result" to interpret the Safe Haven Act "to render the local department and juvenile courts powerless to protect [] a newborn in a CINA proceeding." We agree.

A child can be found to be a CINA only if the juvenile court first finds that the child "has been abused, has been neglected, has a developmental disability, or has a mental

35

disorder[.]" CJP § 3-801(f)(1). For an unharmed newborn who is left with a responsible adult or at a designated facility under the Safe Haven Act, the child cannot be a CINA unless the juvenile court finds that the child "has been neglected." *See id.* If, as Mother argues, the language of the Safe Haven Act granting immunity from "civil liability" precludes a CINA neglect finding, a local department of social services would have no legal authority to provide the care, protection, safety, development, and placement or reunification required by the CINA Statute. *See* CJP § 3-802(a).

Apparently realizing the absurdity of such result, Mother argues in her opening brief that the local department can take custody of the newborn under CJP § 3-815(a), which authorizes shelter care,[12] and then file a petition for guardianship leading to adoption. FL §§ 5-313, 5-320(a)(1)(iii)1.A. & C. The Department correctly responds that any path toward guardianship with the right to consent to adoption requires a prior judicial finding that the newborn is a CINA. *See* FL § 5-302(a) (stating that "[t]his subtitle applies only to: (1) guardianship of an individual who is committed to a local department as a child in need of assistance").[13] In her reply brief, Mother shifts gears to claim that the local department

---

[12] Mother overlooks the fact that CJP § 3-815(a) authorizes "shelter care for a child *who may be in need of assistance*." (Emphasis added). If, as Mother contends, the immunity from "civil liability" under the Safe Haven Act precludes a finding of neglect for compliance with the Act, the local department would have no substantial basis for invoking Section 3-815 absent other evidence of neglect.

[13] In her reply brief, Mother points out that in 2002 FL § 5-313 permitted the local department to petition for guardianship leading to adoption without a prior CINA finding. However, FL § 5-302 was amended in 2005 to require such a CINA finding. Senate Bill 710, 2005 Leg., 420th Sess. (Md. 2005). More importantly, the legislature never amended the Safe Haven Act after 2005 to permit the local department to petition for guardianship for a child who was not a CINA.

can assume guardianship of a newborn without a neglect finding by petitioning for guardianship of a minor under Section 13-702 of the Estates and Trusts Article ("ET").

ET § 13-702 provides, in relevant part, that "[o]n petition by any person interested in the welfare of the minor, . . . the court may appoint a guardian of the person of an unmarried minor if the court finds" the appointment to be in the best interest of the minor, no testamentary appointment has been made, and no parent is willing or able to serve or files an objection or each parent consents to the appointment. ET § 13-702(a)(1). Mother has cited to no legal authority that the Department is a "person interested in the welfare of the minor" or is qualified to be appointed as the guardian of the person of a minor.[14] More importantly, there is nothing in ET § 13-702 that entitles the minor to the protection, services, and other benefits that the Department is required to provide under the CINA Statute.

In sum, Mother's interpretation of the Safe Haven Act would lead to an absurd and illogical result. To preclude a CINA neglect finding would abrogate a regulatory system that was designed to implement the provisions of the Safe Haven Act and has been in operation for over twenty years, and replace it with an unproven scheme that clearly does not provide the proper care and attention for an abandoned newborn.

Therefore, this Court holds that immunity from "civil liability" under the Safe Haven Act does not preclude a finding of "neglect" under the CINA Statute. Accordingly,

---

[14] Unlike guardian of the property of a minor or a disabled adult or guardian of the person of a disabled adult, there is no statutory provision that lists the persons entitled to appointment as guardian of the person of a minor, or their respective priorities. *See* ET §§ 13-207 & 13-707.

the juvenile court did not err by finding that the Mother's actions constituted "neglect" under CJP § 3-801(t)(1).

**ORDERS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FILED ON JANUARY 17, 2025, AFFIRMED. COSTS TO BE PAID BY APPELLANT.**